[Crim. No. 13489. In Bank. June 24, 1971.]

In re PRESTON R. TUCKER on Habeas Corpus.

## COUNSEL

Preston R. Tucker, in pro. per., and Dorsey Redland, under appointment by the Supreme Court, for Petitioner.

Thomas C. Lynch, Attorney General, Doris H. Maier, Assistant Attorney General, Edsel W. Haws, Nelson P. Kempsky and David Cunningham, Deputy Attorneys General, for Respondent.

## OPINION

**BURKE, J.**—Petitioner challenges the revocation of his parole by the Adult Authority.[1] He was paroled from Folsom Prison in January 1968, having served a portion of sentences imposed in 1949 for the commission of three first degree robberies and an assault with intent to commit murder. On December 6, 1968, his parole was canceled and his term of sentence reset at the maximum, life imprisonment. At a parole revocation hearing on February 20, 1969, petitioner was advised of the conditions of his parole which his parole officers reported that he had violated, namely, having left the county of his residence without prior approval, and having possessed a firearm. Petitioner admitted the first violation but refused to admit or deny the second. The Adult Authority concluded that he had violated both conditions and revoked his parole on those grounds.

In his petition for habeas corpus, petitioner alleged that the sole evidence before the Adult Authority of his possessing a firearm was his own uncorroborated confession exacted by police officers through duress,

[1]Various other contentions raised by petitioner were considered and rejected by this court in connection with a prior petition filed by petitioner and need not be re-considered here.

threats and promises, and without the warnings required under *Miranda* v. *Arizona,* 384 U.S. 436 [16 L.Ed.2d 694, 86 S.Ct. 1602, 10 A.L.R.3d 974]. Since the People disputed petitioner's claim that his statement was involuntary, we appointed a referee to receive evidence on that and other factual questions raised by the pleadings. (See *In re Gomez,* 64 Cal.2d 591 [51 Cal.Rptr. 97, 414 P.2d 33].)

After a hearing, the referee found that the Adult Authority had relied exclusively upon petitioner's statement that he had possessed a firearm while on parole. However, the referee also found that the statement was free and voluntary. ▮ Although a referee's findings are not binding upon this court, they are entitled to great weight if supported by substantial evidence. (*In re Branch,* 70 Cal.2d 200, 203, fn. 1 [74 Cal.Rptr. 238, 449 P.2d 174].) In the instant case, both police officers testified that petitioner's statement was made without duress, threats or promises of any kind.[2] Accordingly, we adopt the finding of the referee that the statement was freely and voluntarily given by petitioner.

▮ The referee also found that the officers had failed to give petitioner any of the warnings required under *Miranda, supra,* since they did not consider petitioner to be a suspect in the case. ▮ We need not reach the question whether or not petitioner was entitled to these warnings, for it is now settled that the Adult Authority properly may consider and act upon a voluntary confession or statement obtained from a parolee without first apprising him of his constitutional rights. (*In re Martinez,* 1 Cal.3d 641, 650 [83 Cal.Rptr. 382, 463 P.2d 734].)

▮ We have concluded that the Adult Authority properly considered petitioner's statement in deciding whether to revoke his parole, and that the statement constituted sufficient cause (Pen. Code, § 3063) to justify parole revocation.

▮ Petitioner further contends that he was denied due process of law in that the Adult Authority on February 20, 1969, "forced petitioner to appear before them without informing petitioner of his rights and without benefit of counsel. . . ." Petitioner misconceives the nature and purpose of parole revocation hearings before the Adult Authority.

It is true that the parole revocation procedure adopted by the Adult

---

[2]Petitioner's statement was elicited in the course of police investigation of an Oakland murder. The interrogating officers initially explained to petitioner that he was not a suspect, and that the police were simply attempting to trace the chain of possession of the weapon. *After* petitioner had executed the statement admitting possession, one of the officers agreed to recommend to the parole authorities that petitioner's parole not be revoked. The officers denied that petitioner's statement was made in reliance upon this agreement.

Authority bears certain features common to an ordinary criminal trial or other adversary proceeding.[3] Through these procedures, parolees are informed of the nature of the parole violations and are given an opportunity to deny, admit or explain them. ■ Since the existence of good cause to revoke a parole may be challenged on habeas corpus, such procedures "not only discourage needless judicial review but will impart a sense of fairness in the state's dealings with its parolees." (*In re Gomez, supra,* 64 Cal.2d 591, 594, fn. 1.)

However, the use of certain procedures and nomenclature common to a criminal trial does not alter the fundamental character of parole revocation hearings. As the Authority itself acknowledges, these procedures are "not required by law" (Policy Statement, *supra,* p. 1), and revocation rests entirely in the discretion of the Adult Authority in carrying out its responsibility over parole matters. Under Penal Code section 3060, the Authority is given "full power to suspend, cancel or revoke any parole without notice, and to order returned to prison any prisoner on parole." The sole statutory restriction upon the power to revoke parole is section 3063, which provides that "no parole shall be suspended or revoked without cause, which cause must be stated in the order suspending or revoking the parole."

■ This court has held that the Adult Authority may revoke parole without notice *or hearing (In re Gomez, supra,* 64 Cal.2d 591, 594; *In re McLain,* 55 Cal.2d 78, 84 [9 Cal.Rptr. 824, 357 P.2d 1080]),[4] and the provisions of the California Administrative Procedure Act (Gov. Code, § 11370 et seq.) are inapplicable to Adult Authority parole proceedings

---

[3]Thus, adopting the nomenclature of criminal proceedings, the Authority has established a parole revocation "calendar" whereby each prisoner is given advance notice of a "hearing" to be held to give the prisoner an opportunity for a "personal appearance" before a panel of the Adult Authority as a final step in "adjudicating" the termination of his parole. Prior to the hearing, the prisoner is "served" with a copy of the "charges" made against him; he is thereupon asked to "enter a plea" to these charges; if he pleads "guilty," that plea is accepted without further inquiry; if he pleads "not guilty," the panel reviews the "evidence" pertaining to each charge, including oral or documentary evidence submitted by the prisoner. Thereafter, the panel makes its "findings" and enters its "order" regarding parole. (See Adult Authority Resolution No. 279 [rev. July 7, 1969]; Adult Authority Policy Statement No. 22 [June 3, 1969].)

[4]As stated in *In re McLain, supra,* 55 Cal.2d 78, 85, "The provisions for determining or redetermining sentence and for granting, suspending or revoking parole do not violate due process because of the absence of a requirement for notice or hearing. The notice of a hearing was given and required to be given in the proceedings which resulted in the original conviction. Those proceedings resulted in a conviction and the imposition of a sentence that was indeterminate, and until fixed, amounted to a maximum sentence provided for the crime in question. When the Authority reduces a maximum sentence, its action, in the very nature of things, is tentative and may be changed for cause."

(see Gov. Code, §§ 11500, subd. (a), 11501; cf. *Hyser* v. *Reed* (1963) 318 F.2d 225, 236-237 [115 App. D.C. 254], cert. den. 375 U.S. 957 [11 L.Ed. 2d 315, 316, 84 S.Ct. 446, 447]). Moreover, in *In re Schoengarth,* 66 Cal.2d 295, 304 [57 Cal.Rptr. 600, 425 P.2d 200], we rejected the suggestion that parole hearings were in the nature of judicial proceedings requiring the presence of counsel, stating "The proceedings of the Adult Authority are wholly administrative in nature, and that agency's determination of the length of sentence or conditions of parole is not a judicial act." (See also *In re Sandel,* 64 Cal.2d 412, 415 [50 Cal.Rptr. 462, 412 P.2d 806].)

Therefore, notwithstanding the Adult Authority's internal characterization of parole revocation proceedings as involving an "adjudication" process, revocation of parole cannot be considered a judicial act. This fact seemingly would distinguish these proceedings from the deferred sentencing procedures involved in *Mempa* v. *Rhay,* 389 U.S. 128 [19 L.Ed.2d 336, 88 S.Ct. 254], relied upon by petitioner. In *Mempa,* defendant was brought before the trial court for a hearing on the revocation of his probation and the imposition of his sentence, which had been deferred during the probationary period. ▇▇▇ As these proceedings constituted merely a continuation of the original judicial proceedings instituted against defendant, the United States Supreme Court held that defendant had a right to be represented in court by counsel, stating that right to counsel extends to "every stage of a criminal proceeding where substantial rights of a criminal accused may be affected." (389 U.S. at p. 134 [19 L.Ed.2d at p. 340].) The court stressed that counsel's assistance would be required to influence "judicial discretion" (the trial court was authorized to make recommendations to the Board of Prison Terms and Paroles regarding defendant's actual prison term) and to protect defendant's "legal rights" (such as right to appeal). (389 U.S. at p. 135 [19 L.Ed.2d at pp. 340-341].) However, it is significant that the court did not suggest that counsel would be required during the subsequent administrative stage when the board itself determines the actual term which defendant must serve.

The California courts recognized prior to *Mempa* that counsel's presence was required at all judicial proceedings involving the imposition of sentence. (*In re Perez,* 65 Cal.2d 224, 229-230 [53 Cal.Rptr. 414, 418 P.2d 6]; *In re Klein,* 197 Cal.App.2d 58 [17 Cal.Rptr. 71].) However, we have acknowledged that the *Mempa* case "is inapplicable to cases of termination of conditional release which involve no such sentencing [citations]" such as parole revocation proceedings. (*In re Marks,* 71 Cal.2d 31, 47, fn. 11

[77 Cal.Rptr. 1, 453 P.2d 441]; see *People* v. *St. Martin,* 1 Cal.3d 524, 538 [83 Cal.Rptr. 166, 463 P.2d 390].)[5]

Unlike the situation in *Mempa,* parole revocation proceedings occur in an entirely nonjudicial setting, wherein both judgment of conviction and sentence have been imposed by the court, no further judicial proceedings take place, and the revocation hearing itself is one gratuitously but nevertheless quite properly offered and conducted by the Adult Authority pursuant to its own internal rules of procedure and its desire to accord the prisoner an opportunity to be heard. ■ Nor does revocation of parole involve any "substantial" or "legal" rights of the prisoner, for prisoners on parole remain under legal custody and are subject to be returned to prison at any time. (Pen. Code, § 3056; *People* v. *Villareal,* 262 Cal.App. 2d 438, 447 [68 Cal.Rptr. 610]; *People* v. *Hernandez,* 229 Cal.App.2d 143, 149 [40 Cal.Rptr. 100].) Parole is considered to be a matter of grace, a privilege and not a right, and is committed entirely to the discretion of the Adult Authority. (*In re Schoengarth, supra,* 66 Cal.2d 295, 300; *People* v. *Ray,* 181 Cal.App.2d 64, 69 [5 Cal.Rptr. 113], cert. den. 366 U.S. 937 [6 L.Ed.2d 848, 81 S.Ct. 1662].)

Thus, a majority of the courts which have considered the question have held that the *Mempa* case does not require the presence of counsel at parole revocation proceedings. (See *Pope* v. *Superior Court,* 9 Cal.App.3d 644, 647 [88 Cal.Rptr. 488]; *Johnson* v. *Stucker* (1969) 203 Kan. 253 [453 P.2d 35, 39-40], cert. den. 396 U.S. 904 [24 L.Ed.2d 180, 90 S.Ct. 218]; *John* v. *State* (N.D. 1968) 160 N.W.2d 37; *Beal* v. *Turner* (1969) 22 Utah 2d 418 [454 P.2d 624, 625]; *Mead* v. *California Adult Authority* (9th Cir. 1969) 415 F.2d 767, 768; *Dunn* v. *California Department of Corrections* (9th Cir. 1968) 401 F.2d 340, 342; *Ernest* v. *Willingham* (10th Cir. 1969) 406 F.2d 681; *Rose* v. *Haskins* (6th Cir. 1968) 388 F.2d 91, cert. den. 392 U.S. 946 [20 L.Ed.2d 1408, 88 S.Ct. 2300]; *Menechino* v. *Oswald* (2d Cir. 1970) 430 F.2d 403, 409; but see *Commonwealth* v. *Tinson* (1969) 433 Pa. 328 [249 A.2d 549]; *Menechino* v. *Warden* (1971) 27 N.Y.2d 376 [318 N.Y.S.2d 449, 267 N.E.2d 238]; *Ellhamer* v. *Wilson* (N.D.Cal. 1969) 312 F.Supp. 1245 (app. pending 9th Cir.).*)

It is undeniable, of course, that under certain circumstances counsel could

---

[5]Of course, in most cases revocation of parole necessarily affects the length of the term which defendant must serve, for under Adult Authority Resolution No. 171 [1951], "when paroles are cancelled, suspended, and/or revoked, the previous action fixing term will be rescinded (except in those cases where the prisoner shall be considered as serving the maximum) and the prisoner shall be considered as serving the maximum term as prescribed in the Indeterminate Sentence Law, subject to further order of the Adult Authority. . . ." However, the actual sentence previously imposed by the court remains unaffected by either the parole or subsequent revocation thereof.

*Reporter's Note: The opinion of United States Court of Appeals, Ninth Circuit reversing orders granting writs of habeus corpus was filed July 7, 1971, 445 F.2d 856.

assist the prisoner in contesting the parole revocation charges. And yet the ability of counsel to assist is not dispositive of the broader question whether due process demands counsel's presence at parole hearings. ██ " 'Due process' is an elusive concept. Its exact boundaries are undefinable, and its content varies according to specific factual contexts. . . . ██ Whether the Constitution requires that a particular right obtain in a specific proceeding depends upon a complexity of factors. The nature of the alleged right involved, the nature of the proceeding, and the possible burden on that proceeding, are all considerations which must be taken into account." (*Hannah* v. *Larche,* 363 U.S. 420, 442 [4 L.Ed.2d 1307, 1321, 80 S.Ct. 1502]; see *Sokol* v. *Public Utilities Commission,* 65 Cal.2d 247, 254 [53 Cal.Rptr. 673, 418 P.2d 265].) ██ Those elements of due process deemed essential for the protection of one accused of a crime are not inevitably guaranteed to one duly convicted of a crime. If the accused has been fairly tried, defended, convicted and sentenced, and has been afforded reasonable opportunity to appeal his conviction, the essential demands of due process have been fulfilled. ██ Once the adjudicative process has ceased and the rehabilitative stage commenced, it becomes the responsibility of the Adult Authority to determine, in its discretion, the appropriate terms and conditions for the release of the offender to society. At this stage, due process only requires that the Adult Authority discharge its responsibilities in good faith, neither arbitrarily nor capriciously, and that judicial review remains available to correct abuses of discretion. (See *In re McLain, supra,* 55 Cal.2d 78, 85-87.)

██ Moreover, in determining whether or not a particular procedure violates due process requirements, we should bear in mind the probable costs and consequences involved in casting excessive burdens upon administrative machinery. (*In re Martinez, supra,* 1 Cal.3d 641, 649-650; *Hannah* v. *Larche, supra,* 363 U.S. 420, 442.) "If, as appellant demands, each prisoner is to appear with counsel we may reasonably anticipate that the administrative burden (including the preparation of advance notice, the subpoenaing and cross-examination of witnesses, arguments of counsel and preparation of written decisions) would be enormously increased, accompanied by the usual delays attendant upon clogged calendars." (*Menechino* v. *Oswald, supra,* 430 F.2d 403, 410, discussing the problem in the context of parole release hearings.

The transformation of an essentially informal, post-adjudicative, administrative procedure into a judicial proceeding, with all the concomitants of a nonjury criminal trial, could ultimately lead to the abandonment of the benevolent practice of releasing prisoners to the constructive custody of parole officers. (*In re Marks, supra,* 71 Cal.2d 31, 48, and fn. 12; see

*Pope* v. *Superior Court,* 9 Cal.App.3d 636, 641 [88 Cal.Rptr. 483].) The Adult Authority is entrusted with the grave responsibility of determining under what circumstances prisoners should be released to, and returned from, parole. Any undue interference with or restriction upon the power of the Adult Authority to revoke parole could substantially inhibit its willingness to grant the parole privilege in future cases, to the ultimate detriment of the entire penal system.

 Accordingly, we conclude that petitioner was not entitled to the assistance of counsel at the parole revocation hearing.

The order to show cause is discharged and the petition for writ of habeas corpus is denied.

Wright, C. J., McComb, J., Mosk, J., and Sullivan, J., concurred.

**MOSK, J.**—I concur in Justice Burke's opinion. The dissenting opinions, however, impel me to add this postscript.

Justice Tobriner implies that parole officers are malevolent functionaries dedicated to the deprivation of normal human existence by the parolees in their charge. Justice Peters asserts those of us in the majority adhere to a fiction "so divorced from reality that it cannot be tolerated by any fair-minded man." It is my two learned colleagues, with their gaze commendably fixed on the stars, who are tripping over reality.

Parole officers, like all public servants, are presumed to faithfully perform their duties, and there are several pragmatic reasons why they would do so.[1] First, the economy of the state, particularly in these times of austerity, benefits from the release of prisoners, and conversely, suffers the burden of support whenever it must incarcerate increasing numbers of prison inmates. There has been a markedly expanded use of parole procedures in recent years. Second, parole officers are understandably desirous of demonstrating that parole works; the merit of the system is measured by those who achieve successful adjustment on parole, not by numbers of revocations. Third, there is absolutely no empirical evidence that the parolee who "works at a job, lives with his family . . . and generally pursues a normal law-abiding

[1]"Parole and probation officers are thus indispensable, and the profession should be vastly elevated in numbers, in prestige, and in salary. Its responsibility is great and should be greater. By their counsel, encouragement, warning, and befriending, many one-time offenders, with whom they keep in touch, are supported in new life efforts by these skilled and experienced guides and friends." (Dr. Karl Menninger, The Crime of Punishment (1968) p. 266; also see Clark, Crime in America (1970) pp. 237-238.)

life" (Tobriner dissent, *post,* p. 193) is deemed a parole violator, and no motivation for parole officers seeking return of such an exemplary person to prison has been suggested. In the instant case petitioner Tucker admitted possession of a gun, a dubious indication of a normal law-abiding life.

Justice Tobriner's literate discussion of the due process requirements of timely and adequate notice, and an opportunity to be heard, is more academic than apposite here. The real thrust of his dissent, and its departure from the norm, is the insistence upon presence of counsel at parole proceedings. He would require counsel for every parolee, the indigents to obtain representation at state expense.

Although Justice Burke has demonstrated that counsel is not required before the Adult Authority under existing constitutional, statutory or case law, it can be conceded arguendo that salutary benefits could accrue from the presence of counsel at such administrative proceedings. Indeed I would agree that as an ideal a skilled member of the bar should either be available for hire or provided out of the public treasury for every adult and every juvenile with a civil or criminal problem that has the slightest potential of subjecting him to physical detention, monetary loss or moral humiliation. The day may come when there is an adequate lawyer population and sufficient public sophistication to achieve that ideal. I regret, perhaps more than my dissenting brethren who fail to consider the problem of logistics, that the day does not yet appear on the horizon. Nor will it be hastened by judicial fiat.

A few statistics may be instructive. The California penal institution population was 28,462 at the beginning of 1969, an increase of 6,200 felons over the preceding decade.[2] The annual increase in the number of inmates has ranged from slight in some years as to as much as 13.5 percent, as was the case in 1958.

Ninety-two percent of all felons released from prison are placed on parole. The current parole population consists of 10,764 men and 1,069 women, increases of 59.1 and 65.7 percent respectively over the preceding 10 years. Eighteen percent of the male, and 15.3 percent of the female parolees are found to be violators within the very first year of their parole, some by infractions of parole conditions and some by the conviction of other crimes. After the first year, the violation ratio rises sharply. Between 45 and 51 percent of all parolees have their parole suspended after the first and before the second year of parole, and by the fifth year as many as 63.9 percent are determined to be violators.

---

[2]All figures used herein were reported by the Department of Corrections, State of California, in its most recent publication, California Prisoners 1968.

.·. The picture is not quite as bleak as it may seem at first blush. For every 100 paroles suspended, approximately 23 are reinstated without additional confinement. The most common circumstance reported by the Department of Corrections is the parolee whose whereabouts are unknown; when found, and if he has been law-abiding while at large, he will be reinstated forthwith.

The foregoing data have relevance to our problem. We are not here concerned merely with the difficulties of Preston Tucker; we must view the broad spectrum of more than 4,000 parole suspensions each year, and of that number of parolees some move in and out of the parole system two or three times as they attempt the difficult adjustment to an orderly society.

Formal hearings, with counsel hired or provided, for the more than 4,000 parole suspensions annually would alone require an undertaking of heroic proportions.[3] But that is only the beginning. For if there is a right to counsel at parole revocation or suspension proceedings, no reason in law or logic can be advanced why a prisoner, appearing before the Adult Authority as an applicant for parole and seeking to have his indeterminate sentence made determinate, should not also have legal representation. A rule providing counsel for a felon facing suspension of parole but not for a felon seeking parole would constitute invidious discrimination and be constitutionally defective. Thus we must consider the practicality of the presence of counsel every year for every appearance before the Adult Authority of every prisoner who has served his minimum sentence or a percentage thereof.

The conclusion is inescapable that my dissenting brethren are in effect insisting upon counsel for a potential of 32,000 appearances annually: 28,000 parole applicants[4] and 4,000 parole revokees. This monumental requirement would stagger the imagination.

To compound the logistical problem, the Adult Authority of necessity

---

[3] A few states allow counsel at parole revocation hearings, but no state has a volume of proceedings comparable to California (e.g., California has approximately 43 percent more parole revocations than New York and over six times as many as Pennsylvania (The Book of the States (1966-1967) p. 408)). In Michigan, which permits counsel, in "only a handful of the thousand or so revocations each year has the offender elected to appear at a hearing with counsel." (Kadish, *The Advocate and the Expert-Counsel in the Peno-Correctional Process* (1961) 45 Minn.L.Rev. 803, 838.) The same commentary points out, "given the multitude of parole and revocation proceedings it may prove inordinately expensive and otherwise impractical for the state to provide counsel." (*Id.* at p. 839.)

[4] This figure is slightly less than the total prison population. As indicated above, 92 percent of all prison inmates ultimately are released on parole.

meets in the several correctional institutions. Not one prison is located in any of the nine most populous counties in the state, the counties in which the greater number of members of the bar practice. The supply of counsel, limited as it is, does not exist where the demand would be.[5]

Hearings, to be effective, should be adversary. If counsel are permitted to defend the parolee, it would seem that other counsel should be available to present accusatory evidence. Therein lies still another problem: where will California find the prosecutors for these thousands of cases? Parole officers are nonlawyers, and even if they possessed the skills adequate for parole proceedings, the United States Parole Board complained that ". . . to require [parole officers] to appear at hundreds of revocation hearings annually, convened in many instances at places distant from areas under their supervision, would render it impossible for them to carry on their normal duties." (Sklar, *Law and Practice in Probation and Parole Revocation Hearings* (1964) 55 J.Crim.L., C.&P.S. 175, 195.)

Since *Gideon* v. *Wainwright* (1963) 372 U.S. 335 [9 L.Ed.2d 799, 83 S.Ct. 792, 93 A.L.R.2d 733], the Sixth Amendment right to counsel has been broadly extended. (*Douglas* v. *California* (1963) 372 U.S. 353 [9 L.Ed.2d 811, 83 S.Ct. 814]; *White* v. *Maryland* (1963) 373 U.S. 59 [10 L.Ed.2d 193, 83 S.Ct. 1050]; *Massiah* v. *United States* (1964) 377 U.S. 201 [12 L.Ed.2d 246, 84 S.Ct. 1199]; *Escobedo* v. *Illinois* (1964) 378 U.S. 478 [12 L.Ed.2d 977, 84 S.Ct. 1758]; *Miranda* v. *Arizona* (1966) 384 U.S. 436 [16 L.Ed.2d 694, 86 S.Ct. 1602, 10 A.L.R.3d 974]; *Swenson* v. *Bosler* (1967) 386 U.S. 258 [18 L.Ed.2d 33, 87 S.Ct. 996]; *Anders* v. *California* (1967) 386 U.S. 738 [18 L.Ed.2d 493, 87 S.Ct. 1396]; *People* v. *Feggans* (1967) 67 Cal.2d 444 [62 Cal.Rptr. 419, 432 P.2d 21]; *Entsminger* v. *Iowa* (1967) 386 U.S. 748 [18 L.Ed.2d 501, 87 S.Ct. 1402]; *In re Gault* (1967) 387 U.S. 1 [18 L.Ed.2d 527, 87 S.Ct. 1428]; *United States* v. *Wade* (1967) 388 U.S. 218 [18 L.Ed.2d 1149, 87 S.Ct. 1926]; *Mempa* v. *Rhay* (1967) 389 U.S. 128 [19 L.Ed.2d 336, 88 S.Ct. 254].)

Few thoughtful observers quarrel with the salutary results of the foregoing decisions. But in these past eight years the increased demands upon the legal profession—only a small percentage of which is skilled in the criminal law—have been overwhelming. Public defenders are inundated with cases, and court-appointed counsel are harried. The quantity of work has been reflected in the not infrequent dubious quality of service rendered; petitions to reviewing courts on grounds of inadequate representation have

---

[5]There are 2,220 inmates at the California Conservation Center, located at Susanville, 293 miles northeast of the metropolitan Bay Area. In all of Lassen County there are eight members of the State Bar. One of those members is the district attorney.

multiplied many times. (*People* v. *Ibarra* (1963) 60 Cal.2d 460 [34 Cal. Rptr. 863, 386 P.2d 487]; *In re Smith* (1970) 3 Cal.3d 192 [90 Cal.Rptr. 1, 474 P.2d 969]; Christian, *Delay in Criminal Appeals* (1971) 23 Stan. L.Rev. 676, 693.)

As a thoughtful commentator pointed out in connection with the *Wade* decision: ". . . no one has examined what sort of burden this additional requirement might impose on members of the bar whose resources have already been seriously taxed by recent rulings. The vast expansion of the Sixth Amendment's right to counsel has created an immense burden for the organized bar. Legal Aid and Public Defender programs, while multi-plying with great rapidity, have not been able to scratch the surface of the need for qualified defense lawyers. The last of Gideon's progeny has certainly not yet been seen. . . ." (Read, *Lawyers at Lineups* (1969) 17 U.C.L.A. L.Rev. 339, 377.)

There are three alternatives to this unfolding dilemma. The first is to increase our supply of lawyers. This is eminently desirable, but obviously any recruitment program by law schools will not be felt for some years. The second is to permit unlicensed practice of the law. To a limited extent this was permitted by the United States Supreme Court in *Johnson* v. *Avery* (1969) 393 U.S. 483 [21 L.Ed.2d 718, 89 S.Ct. 747] (also see *In re Harrell* (1970) 2 Cal.3d 675 [87 Cal.Rptr. 504, 470 P.2d 640]), but on any expansive scale such practice would clearly be counterproductive. The third alternative, necessary for the present, is to avoid judicially ex-tending the required presence of hired or appointed counsel beyond the areas compelled by the Constitution. At such time as the numerous practical problems appear ripe for solution, primarily the availability of attorneys in sufficient numbers, we can anticipate adoption of appropriate procedure by the Legislature.

The proposals of the dissenting justices, in the language of our opinion in *In re Marks* (1969) 71 Cal.2d 31, 48 [77 Cal.Rptr. 1, 453 P.2d 441], a case in which this court unanimously denied counsel and hearings in CRC release suspensions, "would impose an excessive burden on the machinery of the administration of justice."

**TOBRINER, J.,** Concurring and Dissenting.—I concur in the denial of the writ of habeas corpus in the present case. From the evidence and findings of this court's referee I do not question that petitioner possessed a revolver while on parole, that he voluntarily admitted orally and in writing to possession of this weapon in violation of Penal Code section 12021, that

the Adult Authority could properly consider petitioner's admission in revoking his parole (*In re Martinez* (1970) 1 Cal.3d 641, 650 [83 Cal. Rptr. 382, 463 P.2d 734]), and that the Adult Authority was justified in revoking parole because of such possession of the proscribed firearm.

I dissent from the majority opinion, however, insofar as it suggests that the Adult Authority need not conduct parole revocation proceedings in accordance with the minimum requisites of due process of law. By characterizing the Adult Authority's procedures as "administrative" and not "judicial" and by considering parole as "a matter of grace, a privilege and not a right," the majority unjustifiably seek to remove the Adult Authority from the established strictures of our constitutional system.

We must reject the use of such conclusory labels as a substitute for careful and reasoned analysis of the relationship between the purposes of parole revocation process and the procedural protections which apply to those proceedings. Such an analysis unavoidably indicates that the parole revocation process must be conducted in accordance with the elemental fairness which our Anglo-Saxon tradition of justice has encased in the concept of due process.

### 1. *The present system.*

The parole revocation process commences when a parole officer has reasonable cause to believe that a parolee has violated the conditions of his parole. If the officer believes that the parole violation is sufficiently serious to constitute cause for revocation,[1] he may report the violation to his unit supervisor.[2] If the parole agent and his supervisor conclude that there is "reasonable cause to believe that [the parolee] has violated his parole and his further liberty does not comport with public welfare or safety,"[3] the parolee is taken into custody and placed in the county jail

---

[1]"Even parole supervision is often cursory and capricious. Many parole agents handle more than 100 cases; one 15-minute interview per month per man is typical. The agents can also rule a parolee's entire life, even forbid him to see or marry his girl, all on pain of reimprisonment—a usually unappealable decision made by parole agents, who thus have a rarely examined effect on the repeater rate. To test their judgment, Criminologists James Robison and Paul Takagi once submitted ten hypothetical parole-violator cases to 316 agents in California. Only five voted to reimprison all ten men; half wanted to return some men but disagreed on which ones." (*The Shame of the Prisons,* Time (Jan. 18, 1971) 48, 53.)

[2]See Comment, *Parole Revocation Hearings—Pro Justicia or Pro Camera Stellata?* (1970) 10 Santa Clara Law. 319, 320-321; Judicial Council, 1968 Sentencing Institute for Superior Court Judges (1969) 126 (remarks of Adult Authority Chairman Kerr).

[3]Adult Authority Resolution No. 256 (1965). Penal Code section 3063 provides "No parole shall be suspended or revoked without cause, which cause must be stated in the order suspending or revoking the parole."

facility without possibility of bail.[4] If the parolee has already been arrested, the officer may place a "hold" so that the parolee cannot be released on bail.[5] The parole officer's written report on the alleged parole violation, together with the comments of the unit supervisor and district administrator, are then submitted to the Adult Authority for consideration at the weekly meetings of a Parole and Community Services (P&CS) panel.

Two P&CS panels, composed of one Adult Authority member and one hearing representative, meet each Friday in both San Francisco and Los Angeles to consider the reports of parole officers and to decide whether parolees in custody should be placed back on parole or have their cases set for parole revocation hearings in Vacaville.[6] A panel may request the parole officer who filed a report to appear at the P&CS proceedings, but the panel ordinarily considers only the officer's written report and the comments of his supervisors.[7] The parolee receives no notice of the proceeding and does not appear.[8] Each panel considers between two and five parole suspensions at each meeting. If the panel finds "cause" for revocation, it suspends parole, sets a date for a revocation hearing, and orders the transfer of the parolee to the Reception Guidance Center at Vacaville.[9]

Parole revocation hearings are conducted at Vacaville within approximately 60 days after the P&SC proceeding.[10] The parolee receives specific notice of the charges against him and may personally appear.[11] If he denies the charges, the hearing representative reads to the parolee the facts on which the charge is based.[12] The parolee may then present written information or his own oral testimony to support his case.[13]

---

[4]See Penal Code sections 3056, 3060.

[5]Milligan, *Parole Revocation Hearings in California and the Federal System* (1968) 4 Cal. Western L. Rev. 18, 20; Department of Corrections, Parole Agent Manual IV-30-IV-36 (1971).

[6]Assembly Interim Committee on Criminal Procedure, Parole Revocation Procedures (1970) page 2; Judicial Council, 1969 Sentencing Institute for Superior Court Judges (1970) page 106 (remarks of Adult Authority Chairman Kerr.)

[7]*Id.*

[8]Van Dyke, *Parole Revocation Hearings in California: The Right to Counsel* (1971) 59 Cal.L.Rev. 1215, 1220. We are indebted to this forthcoming publication for a thorough study of Adult Authority procedures.

[9]Comment, 10 Santa Clara Law., *supra*, 319, 321.

[10]Judicial Council, Proceedings of the First Sentencing Institute for Superior Court Judges (1965) pages 105-106 (remarks of Adult Authority member Brewer.)

[11]Adult Authority Resolution No. 279 (1969).

[12]Van Dyke, *Parole Revocation Hearings in California: The Right to Counsel, supra,* 59 Cal.L.Rev. 1215, 1221.

[13]Adult Authority Resolution No. 279.

The parole officer, whose report forms the basis for the parole suspension, never appears at the revocation hearing, and the parolee often does not see the report and other written material which the representative considers.[14] No witnesses appear to support the charges, and the parolee may not bring witnesses in his own behalf or cross-examine witnesses against him.[15] The parolee may not be represented by counsel at the revocation hearing.[16] Nor may the parolee's attorney or any other member of the public attend the hearing as an observer.[17] No record is kept of the proceeding.[18]

The revocation hearings ordinarily run between 15 and 30 minutes and are conducted by two Adult Authority hearing representatives.[19] While one representative considers a case and questions a prisoner, the other representative acquaints himself with the reports of the following case on the calendar. The representatives alternate in reading and hearing cases.[20] Although only one representative can devote full attention to any particular case, both representatives ordinarily concur in the decision to revoke parole. The decision may rest on information in the written reports which is never presented at the hearing.[21] That decision only indicates that the parolee has been found guilty of the charges against him[22] by a preponderance of the evidence[23] and does not state the reasons for the decision.[24]

The California Assembly Interim Committee on Criminal Procedure recently summarized the parole revocation process in this state:

[14]Comment, 10 Santa Clara Law., *supra*, 319, 322-323.

[15]*Id.*

[16]Assembly Interim Committee on Criminal Procedure, Parole Revocation Procedures, *supra*, page 4.

[17]Van Dyke, *Parole Revocation Hearings in California: The Right to Counsel*, *supra*, 59 Cal.L.Rev. 1215, 1221.

[18]See footnote 24 *infra*.

[19]Van Dyke, *Parole Revocation Hearings in California: The Right to Counsel*, *supra*, 59 Cal.L.Rev. 1215, 1221.

[20]Assembly Interim Committee in Criminal Procedure, Parole Revocation Procedures, *supra*, pages 3-4.

[21]Comment, 10 Santa Clara Law., *supra*, 319, 323.

[22]See Penal Code section 3063; *In re McLain* (1960) 55 Cal.2d 78, 86-87 [9 Cal. Rptr. 824, 357 P.2d 1080].

[23]*In re Anderson* (1951) 107 Cal.App.2d 670, 673 [237 P.2d 720]; but cf. *In re Winship* (1970) 397 U.S. 358, 361-364 [25 L.Ed.2d 368, 373-375, 90 S.Ct. 1068]; *Woodby* v. *Immigration and Naturalization Service* (1966) 385 U.S. 276, 285 [17 L.Ed.2d 362, 368, 87 S.Ct. 483].

[24]See *In re Martinez* (1970) 1 Cal.3d 641, 646, footnote 3 [83 Cal.Rptr. 382, 463 P.2d 734]; *In re Gomez* (1966) 64 Cal.2d 591, 594, footnote 1 [51 Cal.Rptr. 97, 414 P.2d 33]; *People* v. *Dorado* (1965) 62 Cal.2d 338, 359-360 [42 Cal.Rptr. 169, 398 P.2d 361]; *In re McLain, supra*, 55 Cal.2d 78, 85-87; *In re Smith* (1949) 33 Cal.2d 797, 803 [205 P.2d 662]; *In re Payton* (1946) 28 Cal.2d 194, 197 [169 P.2d 361].

"During this entire process, from the time the parole officer and his unit supervisor first decide to report the alleged violation to the time when the panel resets his term at maximum, the parolee is without any formal rights. Under California law he need not be given notice, he has no right to counsel, no right to present witnesses and no right to cross examine witnesses against him. Indeed, during some of the most important stages of the procedure, he does not even have the right to be present. And when he finally does have the right to be present he has usually been cut off for a month or more from any help that he might have received in preparing his case. Assuming he is innocent or assuming there are compelling circumstances in mitigation of his case, he has no way of marshalling the evidence he will need to convince the panel. Usually he will be hundreds of miles from his home or the scene of the alleged violation. There will be no one he can rely on to interview witnesses, gather evidence, or advise him on how to present his case. He can only speak for himself and he is forced to confront, not witnesses, but sheaves of reports he has never even looked at. The reports themselves are the product of a parole officer who wrote them after he participated in the initial decision to revoke parole. There is no way to check the reliability of the parole officer's observations, no way to evaluate the reliability of his sources, and no way to determine what conscious or unconscious motivations may have dictated what he put in or left out of his report. In short, the parolee is impotent. He is called before a panel which, statistically, revokes parole in 98% of the cases it hears, and his only procedural safeguard is his own ability to argue."[25]

### 2. Due process applies to parole revocation.

Courts of this state have in the past ruled that the due process clause of the Fourteenth Amendment does not apply to parole revocation proceedings.[26] As described above, the Adult Authority has itself established

---

[25]Assembly Interim Committee on Criminal Procedure, Parole Revocation Procedures, *supra*, pages 4-5.

[26]*In re Gomez, supra*, 64 Cal.2d 591, 594 (no right to notice or hearing on parole revocation); *People* v. *Dorado, supra*, 62 Cal.2d 338, 359-360 (no right to notice or hearing on parole revocation); *In re McLain, supra*, 55 Cal.2d 78, 85 (no right to notice or hearing on parole revocation); *In re Smith, supra*, 33 Cal.2d 797, 803-805 (no right to notice or hearing on determination of length of sentence and parole revocation); see *In re Payton, supra*, 28 Cal.2d 194, 197 (parolee "was fully apprised of all of the charges against him and was granted hearings thereon prior to the" revocation of parole); see *Sturm* v. *California Adult Authority* (9th Cir. 1967) 395 F.2d 446, 448; *Williams* v. *Dunbar* (9th Cir. 1967) 377 F.2d 505, 506. Prior to 1941 a parolee charged with a violation of the terms of his parole possessed the statutory right to notice and to a hearing at which he could produce evidence and witnesses in his behalf. (*In re Etie* (1946) 27 Cal.2d 753, 758-760 [167 P.2d 203].) The present statutory scheme, first enacted in 1941, eliminated those basic procedural rights. (27 Cal.2d at pp. 758-759; see *In re McLain, supra*, 55 Cal.2d 78, 84-85; *In re Smith, supra*, 33 Cal.2d 797, 803.)

a parole revocation process which by grace affords some minimal procedural protections for the parolee, including notice, the opportunity to appear before an impartial decision-making tribunal, and the opportunity to present oral and written material. Yet even these extremely basic procedures are supposedly "not required by law,"[27] and may presumably be terminated at the option of the Adult Authority. The majority of this court attempt to rationalize this position by characterizing the Adult Authority's procedures as "administrative"[28] and not "judicial"[29] and by considering parole as "a matter of grace, a privilege and not a right."[30] The invocation of labels, however, does no more than avoid analysis; it does not provide the basis for careful consideration of the threshold constitutional question of whether due process applies to parole revocation hearings.

The Adult Authority, like all other administrative tribunals, must observe at least the basic elements of procedural due process.[31] The elements of due process vary with the nature of the proceeding, but there remains

[27]Adult Authority Policy Statement No. 22 (1969).

[28]See *People* v. *St. Martin* (1970) 1 Cal.3d 524, 538 [83 Cal.Rptr. 166, 463 P.2d 390]; *In re Schoengarth* (1967) 66 Cal.2d 295, 304 [57 Cal.Rptr. 600, 425 P.2d 200]; *In re Sandel* (1966) 64 Cal.2d 412, 415-416 [50 Cal.Rptr. 462, 412 P.2d 806]; *People* v. *Ray* (1960) 181 Cal.App.2d 64, 68 [5 Cal.Rptr. 113].

[29]E.g., *People* v. *St. Martin, supra,* 1 Cal.3d 524, 538; *In re Sandel, supra,* 64 Cal.2d 412, 415.

[30]See *People* v. *Ray, supra,* 181 Cal.App.2d 64, 69; *In re McManus* (1954) 123 Cal.App.2d 395, 403 [266 P.2d 929]. *Escoe* v. *Zerbst* (1935) 295 U.S. 490, 492-493 [79 L.Ed. 1566, 1568-1569, 55 S.Ct. 818] observed, "we do not accept the petitioner's contention that the privilege has a basis in the Constitution, apart from any statute. Probation or suspension of sentence comes as an act of grace to one convicted of a crime, and may be coupled with such conditions in respect of its duration as Congress may impose." This statement of Justice Cardozo was dicta in so far as it applied to the court's decision in *Escoe,* and does not even mention parole. When the United States Supreme Court held in *Mempa* v. *Rhay* (1967) 389 U.S. 128, 134-135 [19 L.Ed.2d 336, 340-341, 88 S.Ct. 254], that a probationer had the right to appointed counsel at probation revocation hearings (see *Daugherty* v. *Craven* (9th Cir. 1970) 422 F.2d 6; *Hewett* v. *State of North Carolina* (4th Cir. 1969) 415 F.2d 1316, 1322-1325; *In re Turrieta* (1960) 54 Cal.2d 816, 819 [8 Cal.Rptr. 737, 356 P.2d 681]; *In re Cleaver* (1968) 266 Cal.App.2d 143, 160-161 [72 Cal.Rptr. 20]; *In re Koebrich* (1967) 256 Cal.App.2d 678, 679, fn. 1 [64 Cal.Rptr. 355]; *Perry* v. *Williard* (1967) 247 Ore. 145 [427 P.2d 1020]), the court did not even mention *Escoe* and certainly undermined whatever validity the quoted dicta may have once possessed in analyzing the proper approach to due process in parole revocation.

[31]See *Goldberg* v. *Kelly* (1970) 397 U.S. 254, 260-264, 267-271 [25 L.Ed.2d 287, 294-297, 298-301, 90 S.Ct. 1011]; *Jenkins* v. *McKeithen* (1969) 395 U.S. 411, 426-429 [23 L.Ed.2d 404, 419-421, 89 S.Ct. 1843]; *Willner* v. *Committee on Character* (1963) 373 U.S. 96, 105-106 [10 L.Ed.2d 224, 230-231, 83 S.Ct. 1175]; *Wong Yang Sung* v. *McGrath* (1950) 339 U.S. 33, 45-46, 49 [94 L.Ed. 616, 625-626, 628, 70 S.Ct. 445]; *Morgan* v. *United States* (1936) 298 U.S. 468, 477, 479-482 [80 L.Ed. 1288, 1293, 1294-1296, 56 S.Ct. 906]; *Goldsmith* v. *United States Board of Tax Appeals* (1926) 270 U.S. 117, 123 [70 L.Ed. 494, 497, 46 S.Ct. 215]; *Londoner* v. *City of Denver* (1908) 210 U.S. 373, 385-386 [52 L.Ed. 1103, 1112-1113, 28 S.Ct. 708];

no doubt that the requirement of due process adheres to every sort of adjudicative proceeding.[32] As the United States Supreme Court has held, " 'Due process' is an elusive concept. Its exact boundaries are undefinable, and its content varies according to specific factual contexts. Thus, when governmental agencies adjudicate or make binding determinations which directly affect the legal rights of individuals, it is imperative that those agencies use the procedures which have traditionally been associated with the judicial process. On the other hand, when governmental action does not partake of an adjudication, as for example, when a general fact-finding investigation is being conducted, it is not necessary that the full panoply of judicial procedures be used. Therefore, as a generalization it can be said that due process embodies the differing rules of fair play, which through the years, have become associated with differing types of proceedings. Whether the Constitution requires that a particular right obtain in a specific proceeding depends upon a complexity of factors. The nature of the alleged right involved, the nature of the proceeding, and the possible burden on that proceeding, are all considerations which must be taken into account." (*Hannah* v. *Larche* (1960) 363 U.S. 420, 442 [4 L.Ed.2d 1307, 1321, 80 S.Ct. 1502]; *Jenkins* v. *McKeithen, supra,* 395 U.S. 411, 426 [23 L.Ed.2d 404, 419]; *Hyser* v. *Reed* (1963) 318 F.2d 225, 251-252 [115 App.D.C. 254] (concurring and dissent opn. of Bazelon, C. J.).)

Parole revocation clearly involves specific factual determinations which directly and substantially affect the individual's ability to remain on parole, rather than "a general fact-finding investigation" or rule-making proceeding.[33] Hence, we need not rely upon the Adult Authority's own characterization[34] of parole revocation as an adjudicative process in order to find that adjudication occurs and to declare that "it is imperative that those agencies use" at least the basic "procedures which have traditionally been associated with the judicial process." (363 U.S. at p. 442 [4 L.Ed.2d at p. 1321].)

Even though a parolee cannot claim an abstract right conditionally to be released from prison (see *In re Schoengarth, supra,* 66 Cal.2d 295, 302;

*Sokol* v. *Public Utilities Commission* (1965) 65 Cal.2d 247, 254 [53 Cal.Rptr. 673, 418 P.2d 265]; cf. *In re Winship, supra,* 397 U.S. 358, 377-385 [25 L.Ed.2d 368, 382-387] (dissenting opn. of Black, J.).

[32]See *Cafeteria Workers* v. *McElroy* (1961) 367 U.S. 886, 894-895 [6 L.Ed.2d 1230, 1235-1236, 81 S.Ct. 1743]; *Greene* v. *McElroy* (1959) 360 U.S. 474, 507-508 [3 L.Ed.2d 1377, 1396-1397, 79 S.Ct. 1400]; 1 Davis, Administrative Law Treatise (1958) §§ 7.01-7.20, at pp. 407-512.

[33]See *Hyser* v. *Reed, supra,* 318 F.2d 225, 251-252 (concurring and dissenting opn. of Bazelon, C. J.).

[34]Adult Authority Resolution No. 279.

*In re McLain, supra,* 55 Cal.2d 78, 87; *In re Smith, supra,* 33 Cal.2d 797, 803-805), and even though parole itself might be characterized as "a matter of grace, a privilege and not a right," it does not follow that the Adult Authority can decide whether a parole shall be revoked without regard to the fundamental requisites of procedural due process.[35] The essence of due process is "the protection of the individual against arbitrary action." (*Ohio Bell Telephone Co.* v. *Public Utilities Com.* (1937) 301 U.S. 292, 302 [81 L.Ed. 1093, 1100, 57 S.Ct. 724]; see *Slochower* v. *Board of Education* (1956) 350 U.S. 551, 559 [100 L.Ed. 692, 700-701, 76 S.Ct. 637].) We have long recognized that the Adult Authority may not act arbitrarily or upon "whim, caprice, or rumor" in revoking parole. (*In re McLain, supra,* 55 Cal.2d 78, 87; *Dunn* v. *California Department of Corrections* (9th Cir. 1968) 401 F.2d 340, 342; *Eason* v. *Dickson* (9th Cir. 1968) 390 F.2d 585, 589, fn. 4; *Glenn* v. *Reed* (1961) 289 F.2d 462, 463 [110 App. D.C. 85]; *Freedman* v. *Looney* (10th Cir. 1954) 210 F.2d 56, 57; *Fleenor* v. *Hammond* (6th Cir. 1941) 116 F.2d 982, 986.) Procedural due process may well afford the only means for preventing the arbitrary exercise of the Adult Authority's power to revoke parole.

The United States Supreme Court has established that when governmental action will seriously injure or substantially affect the life of an individual, the government must conduct its adjudicative proceedings in accordance with the basic requisites of procedural due process.[36] The effects of parole revocation certainly reach far beyond the consequences of the governmental actions for which the Supreme Court has already required the procedures of due process. For example, the courts have required the governmental authorities to follow the mandates of due process when they seek to discharge public employees,[37] revoke security clear-

---

[35]*Sturm* v. *California Adult Authority, supra,* 395 F.2d 446, 450 (concurring opn. of Browning, J.).

[36]See "*Goldsmith* v. *United States Board of Tax Appeals,* 270 U.S. 117 (1926) (right of a certified public accountant to practice before the Board of Tax Appeals); *Hornsby* v. *Allen,* 326 F.2d 605 (C.A. 5th Cir. 1964) (right to obtain a retail liquor store license); *Dixon* v. *Alabama State Board of Education,* 294 F.2d 150 (C.A. 5th Cir.), cert. denied, 368 U.S. 930 (1961) (right to attend a public college)." *Goldberg* v. *Kelly, supra,* 397 U.S. 254, 262-263, fn. 9 [25 L.Ed.2d 287, 295-296]; *Thorpe* v. *Housing Authority* (1967) 386 U.S. 670 [18 L.Ed.2d 394, 87 S.Ct. 1244] (per curiam) (right to hearing before eviction from public housing); Van Alstyne, *The Demise of the Right-Privilege Distinction in Constitutional Law* (1968) 81 Harv.L. Rev. 1439, 1451-1454; Note, *Constitutional Law: The Parole Status and the Privilege Concept* (1969) Duke L.J. 139, 140-142.

[37]As Justice Jackson observed, "The fact that one may not have a legal right to get or keep a government post does not mean that he can be adjudged ineligible illegally." (*Joint Anti-Fascist Refugee Com.* v. *McGrath* (1951) 341 U.S. 123, 185 [95 L.Ed. 817, 861, 71 S.Ct. 624] (concurring opn.); see *Wieman* v. *Updegraff* (1952) 344 U.S. 183, 191-192 [97 L.Ed. 216, 222-223, 73 S.Ct. 215]; *Endler* v. *Schutzbank* (1968) 68 Cal.2d 162, 168-173 [65 Cal.Rptr. 297, 436 P.2d 297].) In *Fort* v. *Civil*

ances,[38] refuse unemployment compensation,[39] and terminate welfare payments,[40] even though these governmental actions involved matters which would have formerly been considered mere "privileges," "benefits," or questions of "grace."

In *Goldberg* v. *Kelly, supra*, 397 U.S. 254, 261-263 [25 L.Ed.2d 287, 295-296], the United States Supreme Court rejected the distinction between privilege and right in determining the application of due process: "The constitutional challenge cannot be answered by an argument that public assistance benefits are 'a "privilege" and not a "right." ' *Shapiro* v. *Thompson,* 394 U.S. 618, 627, n. 6 (1969). Relevant constitutional restraints apply as much to the withdrawal of public assistance benefits as to disqualification for unemployment compensation, *Sherbert* v. *Verner,* 374 U.S. 398 (1963); or to denial of a tax exemption, *Speiser* v. *Randall,* 357 U.S. 513 (1958); or to discharge from public employment, *Slochower* v. *Board of Higher Education,* 350 U.S. 551 (1956). The extent to which procedural due process must be afforded the recipient is influenced by the extent to which he may be 'condemned to suffer grievous loss,' *Joint Anti-Fascist Refugee Committee* v. *McGrath,* 341 U.S. 123, 168 (1951) (Frankfurter, J., concurring), and depends upon whether the recipient's interest in avoiding that loss outweighs the governmental interest in summary adjudication. [See *Boddie* v. *Connecticut* (1971) 401 U.S. 371 (28 L.Ed.2d 113, 91 S.Ct. 780, 785-788).] Accordingly, as we said in *Cafeteria & Restaurant Workers Union* v. *McElroy,* 367 U.S. 886, 895 (1961), 'consideration of what procedures due process may require under any given set of circumstances must begin with a determination of the precise nature of the gov-

---

*Service Com.* (1964) 61 Cal.2d 331, 334 [38 Cal.Rptr. 625, 392 P.2d 385], we noted that "it is settled [law] that a person cannot properly be barred or removed from public employment arbitrarily or in disregard of his constitutional rights. (*Cramp* v. *Board of Public Instruction, Orange County, Fla.* (1961) 368 U.S. 278, 288. . . ." In *Willner* v. *Committee on Character, supra,* 373 U.S. 96, 102 [10 L.Ed.2d 224, 229, 83 S.Ct. 1175], the United States Supreme Court held that "the requirements of procedural due process must be met before a State can exclude a person from practicing law. . . . [T]he right [to practice law] is not 'a matter of grace and favor.' "

[38]*Greene* v. *McElroy, supra,* 360 U.S. 474, 496-497, 507-508 [3 L.Ed.2d 1377, 1390-1391, 1396-1397]; see *United States* v. *Robel* (1967) 389 U.S. 258, 259-260 [19 L.Ed.2d 508, 511-512, 88 S.Ct. 419]; *Cafeteria Workers* v. *McElroy, supra,* 367 U.S. 886, 894-895 [6 L.Ed.2d 1230, 1235-1236].

[39]See *Sherbert* v. *Verner* (1968) 374 U.S. 398, 404-406 [10 L.Ed.2d 965, 970-972, 83 S.Ct. 1790]; *Speiser* v. *Randall* (1968) 357 U.S. 513, 518-519, 528-529 [2 L.Ed.2d 1460, 1468-1469, 78 S.Ct. 1332]; cf. *California Dept. of Human Resources Development* v. *Java* (1971) 402 U.S. 121, 135 [28 L.Ed.2d 666, 676, 91 S.Ct. 1347, 1356] (concurring opn. of Douglas, J.).

[40]*Goldberg* v. *Kelly, supra,* 397 U.S. 254, 261-264 [25 L.Ed.2d 287, 295-297]; *McCullough* v. *Terzian* (1970) 2 Cal.3d 647, 653, 656-657 [87 Cal.Rptr. 195, 470 P.2d 4].

ernment function involved as well as of the private interest that has been affected by governmental action.' See also *Hannah* v. *Larche,* 363 U.S. 420, 440, 442 (1960)." (Fns. omitted; cf. *Bell* v. *Burson* (1971) 402 U.S. 535, 539 [29 L.Ed.2d 90, 94, 91 S.Ct. 1586].)

The revocation of parole certainly condemns the parolee to suffer far more grievous loss than the other matters for which procedural due process has been constitutionally compelled. (See *Wisconsin* v. *Constantineau* (1971) 400 U.S. 433, 436-437 [27 L.Ed.2d 515, 518-519, 91 S.Ct. 507].) The parolee is not merely a prisoner. (See *In re Marzec* (1945) 25 Cal.2d 794, 797 [154 P.2d 873].) He works at a job, lives with his family, reads books and newspapers of his choosing, enjoys a limited right to travel, makes friends, and generally pursues a normal law-abiding life within the conditions of his parole. (See Note (1971) 84 Harv. L.Rev. 1727.) When his parole is revoked and he is returned to prison, the parolee loses his precious, albeit limited, freedom.[41] He loses his job and his ability to lead a relatively normal life. As a result of the parole revocation he may spend the rest of his life in prison. These consequences are sufficiently severe to invoke at least the basic requisites of due process. (See *Hester* v. *Craven* (C.D.Cal. 1971) 322 F.Supp. 1256, 1261-1265.) In any case, we are not seeking to protect the "grace"[42] or "right" of parole; we are attempting to express and vindicate the right to a fair determination of the facts upon which the state would deprive a person of parole and his concurrent liberty.

Finally, we must confront an argument which apparently underlies the majority's position:

To grant procedures which comport with due process every time parole is suspended would purportedly impose an excessive burden on the administration of the parole system that would far outweigh any speculative benefit. We recognize that parole constitutes a major tool in achiev-

[41]*Sturm* v. *California Adult Authority, supra,* 395 F.2d 446, 449 (concurring opn. of Browning, J.): "When the California Adult Authority entered its order of July 3, 1962, refixing appellant's sentence at ten and one-half years, it substantially extended the prison term which appellant would be required to serve. Appellant's challenge to the constitutionality of that order cannot be answered by pretending that nothing really occurred, merely because a State court, five years earlier, had entered an order fixing appellant's maximum term at life." (See *Ellhamer* v. *Wilson* (N.D.Cal. 1969) 312 F.Supp. 1245, 1255, fn. 5.)

[42]Justice Holmes once observed, "It is one of the misfortunes of the law that ideas become encysted in phrases and thereafter for a long time cease to provoke further analysis." (*Hyde* v. *United States* (1912) 225 U.S. 347, 391 [56 L.Ed. 1114, 1135, 32 S.Ct. 793] (dissenting opn. of Holmes, J.).)

ing the rehabilitation of those convicted of criminal offenses.[43] The parolee is required to live according to a reasonable code of conduct which is intended to assist his adjustment to a normal and useful life.[44] Parole revocation is the Adult Authority's most severe sanction for the parolee's refusal to follow the conditions of his parole.[45] If this court were to raise revocation hearings into full dress criminal trials, we might deter the Adult Authority from granting release for fear that it would be unable to revoke parole when the circumstances indicated that the conditional release had not been successful.[46] We might also so significantly impede the revocation process that some parolees who appear dangerous to society would be permitted to remain at large.

No one argues, however, that the Adult Authority's present procedures impose a substantial handicap upon the machinery of the parole system.[47] Hence, to rule that due process applies to parole revocation and requires only those procedural elements which are already incorporated in the present proceedings obviously could not impose any additional or grievous burden on the Adult Authority. A large number of states, as well as the federal government, grant to parolees far more extensive procedural safeguards than does California, and these protections are afforded without any apparent breakdown in their parole systems.[48] For example, parolees in the

[43]See Note, *Parole Revocation Procedures* (1951) 65 Harv.L.Rev. 309.

[44]See Penal Code section 3053; *In re Bushman* (1970) 1 Cal.3d 767, 776-777 [83 Cal.Rptr. 375, 463 P.2d 727]; *In re Schoengarth, supra,* 66 Cal.2d 295, 300-301; compare Comment, 10 Santa Clara Law., *supra,* 319, 320, fn. 6 with Model Penal Code § 305.17 (Tent. Draft No. 5, 1956) at pp. 102-106 and Comment (1968) 54 Iowa L.J. 497, 498.

[45]"Certainly no circumstance could further that purpose [rehabilitation of parolees] to a greater extent than a firm belief on the part of such offenders in the impartial, unhurried, objective, and thorough processes of the machinery of the law." (*Fleming* v. *Tate* (1946) 156 F.2d 848, 850 [81 App.D.C. 205]; Note, *Constitutional Law: Parole Status and the Privilege Concept, supra,* 1969 Duke L.J. 139, 144; *Recent Developments* (1970) 46 Wash.L.Rev. 175, 181.

[46]See *Williams* v. *Dunbar, supra,* 377 F.2d 505, 506; *Hyser* v. *Reed, supra,* 318 F.2d 225, 261 (opn. of Wright, J.); Note (1968) 40 Colo.L.Rev. 617, 621; but see *Rose* v. *Haskins* (6th Cir. 1968) 388 F.2d 91, 97, 102 (dissenting opn. of Celebrezze, J.); Comment, *Revocation of Conditional Liberty—California and the Federal System* (1955) 28 So.Cal.L.Rev. 158, 158 & fn. 4; cf. President's Commission on Law Enforcement and Administration of Justice, Task Force Report: Corrections (1967) 194.)

[47]In 1968 the Adult Authority with its 9 members and 11 hearing representatives suspended parole in 4,404 cases, granted parole in 6,135 cases, and disposed of a total of 15,675 matters. (Department of Corrections, California Prisoners (1968) 96.) By way of comparison, the Contra Costa County Superior Court with its 9 judges disposed of 10,773 cases during the fiscal year 1968-1969 and San Bernardino County Superior Court with its 11 judges disposed of 14,630 matters during the same period. (Judicial Council of California, Annual Report (1970) 134-135.)

[48]For example, 25 states and the District of Columbia expressly or impliedly provide the statutory right to hearing on parole revocation. (Sklar, *Law and Practice*

federal system have the right to notice, a geographically convenient hearing, retained counsel, production of favorable witnesses, and production of documentary material.[49] If the federal system, and, indeed, most states, are quite capable of utilizing these procedural elements of due process in parole revocation, California certainly should be able to do so.

We proceed to discuss the elements of due process which we believe must be observed in a parole revocation proceeding.[50] Our discussion follows the analytical approach this court suggested in *Sokol* v. *Public Utilities Commission* (1965) 65 Cal.2d 247, 254 [53 Cal.Rptr. 673, 418 P.2d 265], "What is due process depends on circumstances. It varies with the subject matter and the necessities of the situation. (Holmes, J., in *Moyer* v. *Peabody* (1909) 212 U.S. 78, 84 [53 L.Ed. 410, 416, 29 S.Ct. 235].) Its content is a function of many variables, including the nature of the right affected, the degree of danger caused by the proscribed condition or activity, and the availability of prompt remedial measures." (See *Richardson* v. *Perales* (1971) 402 U.S. 389, 399-406 [28 L.Ed.2d 842, 852-855, 91 S.Ct. 1420]; *Hannah* v. *Larche, supra,* 363 U.S. 420, 442 [4 L.Ed.2d 1307, 1321]; *People* v. *Moore* (1968) 69 Cal.2d 674, 681 [72 Cal.Rptr. 800, 446 P.2d 800]; Newman, *The Process of Prescribing "Due Process"* (1961) 49 Cal.L.Rev. 215.)

We need not choose between affording the parolee all rights or according

---

in *Probation and Parole Revocation Hearings* (1964) 55 J. Crim. L. C. & P. S. 175, 179-182.) Judicial decisions have declared the right to a parole revocation hearing in some other states. (See *Rose* v. *Haskins, supra,* 388 F.2d 91, 97, 98, fn. 4 (dissenting opn. of Celebrezze, J.).) At least 18 states and the District of Columbia permit counsel to appear at parole revocation hearings. (See fn. 67 *infra.*)
 A number of state statutes permit the production of favorable witnesses and other procedural rights. (See Sklar, *Law and Practice in Probation and Parole Revocation Hearings,* supra, 55 J. Crim. L. C. & P. S. 175, 181-182.)

 [49] 18 U.S.C.A. § 4207 (1969); 28 C.F.R. § 2.40; *Boddie* v. *Weakley* (4th Cir. 1966) 356 F.2d 242, 244; *Starnes* v. *Markley* (7th Cir. 1965) 343 F.2d 535; *Glass* v. *Markley* (7th Cir. 1965) 339 F.2d 970, 973; *Jones* v. *Rivers* (4th Cir. 1964) 338 F.2d 862, 873-875; *Hyser* v. *Reed, supra,* 318 F.2d 225, 240-246; *Reed* v. *Butterworth* (1961) 297 F.2d 776, 778 [111 App.D.C. 365]; *Glenn* v. *Reed, supra,* 289 F.2d 462; *Robbins* v. *Reed* (1959) 269 F.2d 242, 244 [106 App.D.C. 51]; *Fleming* v. *Tate, supra,* 156 F.2d 848, 849-850; Milligan, *Parole Revocation Hearings in California and the Federal System, supra,* 4 Cal.Western L.Rev. 18, 26-28; *The Ninth Circuit Review* (1969) 20 Hastings L.J. 1016, 1027.

 [50] The President's Commission on Law Enforcement concluded in part that "The offender threatened with revocation should . . . be entitled to a hearing comparable to the nature and importance of the issue being decided. Where there is some dispute as to whether he violated the conditions of his release, the hearing should contain the basic elements of due process—those elements which are designed to ensure accurate fact finding. . . ." (President's Commission on Law Enforcement and Administration of Justice, Task Force Report: Corrections, *supra,* 88.)

him none.[51] We do not and cannot clothe the parolee with the investitures of a defendant in a criminal prosecution, but we submit that he should at least be entitled to these basic and minimal protections of due process: notice, hearing, and representation by counsel.

3. *Due process requires that the parolee receive timely and adequate notice in parole revocation proceedings.*

A cornerstone of the structure of due process of law is that the adjudication of a significant right must be "preceded by notice and opportunity for hearing appropriate to the nature of the case." (*Mullane* v. *Central Hanover Bank & Tr. Co.* (1950) 339 U.S. 306, 313 [94 L.Ed. 865, 873, 70 S.Ct. 652].) Accordingly, the courts have held that due process affords to the affected individual a right to timely and adequate notice in criminal proceedings (e.g., *In re Oliver* (1948) 333 U.S. 257, 273 [92 L.Ed. 682, 694, 68 S.Ct. 499]; *Cole* v. *Arkansas* (1948) 333 U.S. 196, 201 ['92 L.Ed. 644, 647-648, 68 S.Ct. 514]), in civil proceedings (e.g., *Armstrong* v. *Manzo,* 380 U.S. 545, 550-551 [14 L.Ed.2d 62, 65-66, 85 S.Ct. 1187]; *Anderson Nat. Bank* v. *Luckett* (1944) 321 U.S. 233, 246 [88 L.Ed. 692, 704-705, 64 S.Ct. 599, 151 A.L.R. 824]), in juvenile proceedings (e.g., *In re Gault* (1967) 387 U.S. 1, 33-34 [18 L.Ed.2d 527, 549-550, 87 S.Ct. 1428]) and in administrative proceedings (e.g., *Willner* v. *Committee on Character, supra,* 373 U.S. 96, 105 [10 L.Ed.2d 224, 230-231]; *Goldsmith* v. *United States Board of Tax Appeals, supra,* 270 U.S. 117, 123.)

The United States Supreme Court "has consistently made plain that adequate and timely notice is the fulcrum of due process whatever the purposes of the proceeding. See, e.g., *Roller* v. *Holly,* 176 U.S. 398, 409; *Coe* v. *Armour Fertilizer Works,* 237 U.S. 413, 424. Notice is ordinarily the prerequisite to effective assertion of any constitutional or other rights; without it, vindication of those rights must be essentially fortuitous. So fundamental a protection can neither be spared here nor left to the 'favor or grace' of state authorities. *Central of Georgia Ry.* v. *Wright,* 207 U.S. 127, 138; *Coe* v. *Armour Fertilizer Works, supra,* at 425." (*In re Gault, supra,* 387 U.S. 1, 73 [18 L.Ed.2d 527, 571-572] (concurring and dissenting opn. of Harlan, J.); *Jacob* v. *Roberts* (1912) 223 U.S. 261, 265 [56

---

[51]Several courts have held that due process and fundamental fairness require the right to notice and hearing in parole revocation proceedings. (*Alverez* v. *Turner* (10th Cir. 1970) 422 F.2d 214, 220; *Cotner* v. *United States* (10th Cir. 1969) 409 F.2d 853, 856; *Shelton* v. *United States Board of Parole* (1967) 388 F.2d 567, 576 [128 App.D.C. 311]; *Jones* v. *Rivers, supra,* 338 F.2d 862, 873-875; *Fleenor* v. *Hammond, supra,* 116 F.2d 982, 986; but see *Morrisey* v. *Brewer* (8th Cir. 1971) 443 F.2d 942.) The above cases, however, do not grant the parolee rights of confrontation, cross-examination, subpoena, and many of the other procedural incidents of the criminal trial.

L.Ed. 429, 431, 32 S.Ct. 303]; *Twining* v. *New Jersey* (1908) 211 U.S. 78, 110-111 [53 L.Ed. 97, 110-111, 29 S.Ct. 14].) In order to be constitutionally adequate and timely, notice must be "reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections." (*Mullane* v. *Central Hanover Bank & Tr. Co., supra,* 339 U.S. 306, 314 [94 L.Ed. 865, 873]; see *In re Gault, supra,* 387 U.S. 1, 33-34 and fn. 53 [18 L.Ed.2d 527, 549-550]; *Schroeder* v. *City of New York* (1962) 371 U.S. 208, 211 [9 L.Ed.2d 255, 258, 83 S.Ct. 279, 89 A.L.R.2d 1398].)

In the context of parole revocation proceedings, notice is obviously prerequisite to inform the parolee of the reasons that might constitute cause for revocation under Penal Code section 3063.[52] As a matter of practice, and by grace, the Adult Authority does now inform the parolee which condition or conditions of parole he is alleged to have violated. At least some parolees, prior to the hearing, may be shown the parole officer's report, which serves as the basis for the Adult Authority's consideration of his case.[53] If the parolee denies his guilt at the hearing, the representative of the Adult Authority reads to the parolee the basic elements of the parole officer's report, which the parolee must then explain or answer.

The timeliness and adequacy of this notice must be viewed in the light of the surrounding procedural incidents of parole revocation. Often the parolee is informed only that he is suspected of having violated a particular condition of parole. Some of those conditions are so vague as to afford little assistance to the preparation of the parolee's case. For example, a parolee might be informed that he has violated a condition of his parole which reads, "You are to conduct yourself as a good citizen at all times, and your behavior and attitude must justify the opportunity granted by this parole."[54] Or the parolee might be told that he has violated another condition by not "cooperating" with the Parole and Community Services Division of the Adult Authority or his parole agent.[55] The parolee might be informed that his parole is in jeopardy because he has consumed alcoholic beverages "to excess" or that he has associated "with individuals of bad reputation."[56] The parolee might also be informed, in such a way as

---

[52]But see Penal Code section 3060 which provides in pertinent part "The Adult Authority shall have full power to suspend, cancel or revoke any parole without notice, and to order returned to prison any prisoner upon parole."

[53]Van Dyke, *Parole Revocation Hearings in California: The Right to Counsel, supra,* 59 Cal.L.Rev. 1215, 1220 (Interview with Adult Authority representative in September 1970).

[54]Comment, 10 Santa Clara Law., *supra,* 319, 320, fn. 6.

[55]*Id.;* see *Williams* v. *Dunbar, supra,* 377 F.2d 505, 506.

[56]Comment, 10 Santa Clara Law., *supra,* 319, 320, fn. 6.

to afford little opportunity for rebuttal, that he is suspected of transgression of one of the more specific conditions, such as the prohibition of the use or possession of narcotic drugs. Yet the parolee is often not told where, when, or by whom he is suspected of violating the parole condition.

This more detailed information regarding the charge, however, is readily available to the Adult Authority in the parole agent's report, which forms the basis for the proposed revocation. Since some parolees are shown this report, and most parolees hear its substance read aloud at the revocation hearing, we cannot conceive of a substantive reason for refusing a parolee the opportunity to know its contents before the hearing. To permit merely the reading of the report at the hearing itself is to deny the parolee reasonable timely and adequate notice for preparation of a defense. Certainly, a requirement for pre-hearing notification of the report to the parolee would not subject the procedures of the Adult Authority to an extra burden since the report has already been prepared for the use of the P&CS proceeding and the hearing representative.

Under the present practice the parolee at the revocation hearing faces a sheaf of papers which he has neither seen nor read; he has no opportunity to refute the allegations posited in these documents; he has no chance to cross-examine the individuals who informed the Adult Authority of his claimed violations; he has no opportunity to subpoena witnesses against him. Finally, the hearing representative may consider data which is not so much as presented at the hearing and material of which the parolee has no knowledge.

We recognize that the implementation of the traditional rights to cross-examination, confrontation, subpoena, and a decision based upon the evidence adduced at the hearing might entail expense and delay that could obstruct the efficient conduct of the parole hearing. Although we realize that the courts have often held that these traditional rights serve as important safeguards to the integrity of the fact-finding process, they are not necessarily required by the application of due process to the instant factual situation. We have explained that due process does not consist of a package of fixed rights but is a dynamic concept that accords its protections relative to the depth of the individual's deprivation and the countervailing public interest. We believe that a minimum due process protection that can accordingly be applied here is the requirement that the Adult Authority, reasonably prior to the hearing, furnish the parolee with a copy of the report of the parole agent upon which the revocation hearing rests.

Such a procedure in an analogus situation has obtained the approval of the United States Supreme Court. In *Williams* v. *Oklahoma* (1959) 358 U.S. 576, 584 [3 L.Ed.2d 516, 521-522, 79 S.Ct. 421], and *Williams* v.

*New York* (1949) 337 U.S. 241, 244-252 [93 L.Ed. 1337, 1341-1345, 69 S.Ct. 1079], the high court upheld a judge's use of extra-record information in imposing sentence, sustained the trial court's discretionary denial of cross-examination and confrontation, but suggested that the defendant possessed a right to know the information relied upon and an opportunity to explain or rebut it. As the Supreme Court observed in *Green* v. *McElroy, supra,* 360 U.S. 474, 496-497 [3 L.Ed.2d 1377, 1390-1391], "Certain principles have remained relatively immutable in our jurisprudence. One of these is that where governmental action seriously injures an individual, and the reasonableness of the action depends on fact findings, the evidence used to prove the Government's case must be disclosed to the individual so that he has an opportunity to show that it is untrue." (But cf. *Alverez* v. *Turner, supra,* 422 F.2d 214, 218.) Professor Davis, in his Administrative Law Treatise, has also proposed just such a procedure for affording notice in parole revocation proceedings, in which cross-examination may be discretionary or unavailable. (1 Davis, Administrative Law Treatise (1965 Pocket Part) § 7.16, at pp. 174-181; see *Simmons* v. *United States* (1955) 348 U.S. 397, 404-406 [99 L.Ed. 453, 458-460, 75 S.Ct. 397]; *Gonzales* v. *United States* (1955) 348 U.S. 407, 413-416 [99 L.Ed. 467, 472-474, 75 S.Ct. 409].)

The requirement that reasonably prior to the hearing the parolee be provided with a copy of the parole agent's report upon which revocation may be predicated will enable the parolee to prepare his defense, will not exact an administrative burden of the Adult Authority and may, in fact, expedite parole revocation hearings. In the particular context of parole revocation proceedings, due process requires that the parolee receive such timely and adequate notice of the charges against him.

4. *Due process requires that the parolee be accorded an opportunity to be heard in parole revocation proceedings.*

"A fundamental requirement of due process is 'the opportunity to be heard.' *Grannis* v. *Ordean,* 234 US 385, 394. It is an opportunity which must be granted at a meaningful time and in a meaningful manner." (*Armstrong* v. *Manzo, supra,* 380 U.S. 545, 552 [14 L.Ed.2d 62, 66].) In the context of a parole revocation we shall point out that the due process requirement that the hearing be conducted in a "meaningful manner" calls for procedural protections as a matter of right rather than as a matter of grace, as they are now accorded by the Adult Authority. Due process likewise calls for the parolee's right to present voluntary witnesses in his behalf, a procedure now denied by the Adult Authority. As to the due process requirement of a hearing held at a "meaningful time," we shall

explain that the parolee must be afforded an opportunity to be heard prior to the suspension of parole, except in those cases in which the Adult Authority has probable cause to believe that the parolee while on parole has engaged in criminal conduct.

Under its present procedures the Adult Authority by grace permits the parolee to appear personally at the parole revocation hearing, to offer both written material and his own oral testimony in his behalf, to present oral arguments why his parole should not be revoked, and to receive a decision from the Adult Authority representatives who actually hear the facts of his case and who have not previously participated in the proceedings against him.[57] These procedural protections, however, should not be subject to repeal in whole or in part or suspension in individual cases in the uncontrolled discretion of the Adult Authority; they are, indeed, the basic requirements of a constitutionally adequate revocation hearing.

The United States Supreme Court, moreover, has held that in an adjudicative proceeding such as that of parole revocation "due process of law requires that, at some stage of the proceedings, before the [governmental action] becomes irrevocably fixed, the [affected individual] shall have an opportunity to be heard, of which he must have notice . . . . Many requirements essential in strictly judicial proceedings may be dispensed with in proceedings of this nature. But even here a hearing, in its very essence, demands that he who is entitled to it shall have the right to support his allegations by argument, however brief; and, if need be, by proof, however informal." (*Londoner* v. *City of Denver, supra,* 210 U.S. 373, 385-386 [52 L.Ed. 1103, 1112]; see *Oyler* v. *Boles* (1962) 368 U.S. 448, 452 [7 L.Ed.2d 446, 450, 82 S.Ct. 501].) Indeed, a hearing which complies with due process must permit the parolee to appear personally at the parole revocation hearing (see *Lewis* v. *United States* (1892) 146 U.S. 370 [36 L.Ed. 1011, 13 S.Ct. 136]), to offer both written material (see *Yakus* v. *United States* (1944) 321 U.S. 414, 436 [88 L.Ed 834, 854-855, 64 S.Ct. 660]) and his own oral testimony in his behalf (see *Goldsmith* v. *United States Board of Tax Appeals, supra,* 270 U.S. 117, 123 [70 L.Ed. 494, 497], to present oral arguments why his parole should not be revoked (see

---

[57] Adult Authority Resolution No. 279 provides in pertinent part,

"A. PURPOSE. The purpose of a revocation calendar is to provide a means whereby each of the charges specified by the P&CS Division or causes for the revocation hearing may be reviewed with the man at a personal appearance before a panel of the Adult Authority as a final step in adjudicating the termination of a parole. . . .

B. REQUIREMENT FOR REVOCATION OF PAROLE. . . . 3. Requires that the man be given an opportunity for a personal appearance before a panel of the Adult Authority for the purpose of entering a plea. He may either admit his guilt or set forth his reasons for denial of guilt orally and/or by documentation on any or all parole violation charges specified."

*FCC* v. *WJR* (1949) 337 U.S. 265, 267, 274-276, 284 [93 L.Ed. 1353, 1356, 1359-1361, 1365, 69 S.Ct. 1097]; *Shields* v. *Utah Idaho Central Railroad Co.* (1938) 305 U.S. 177, 182 [83 L.Ed. 111, 115-116, 59 S.Ct. 160]) to receive a decision from the officials who actually hear the facts of his case (see *Morgan* v. *United States, supra,* 298 U.S. 468, 481-482 [80 L.Ed. 1288, 1295-1296]) and who are impartial (see *In re Murchison* (1955) 349 U.S. 133, 136-137 [99 L.Ed. 942, 946-947, 75 S.Ct. 623]; *Wong Yang Sung* v. *McGrath, supra,* 339 U.S. 33, 45-46 [94 L.Ed. 616, 625-626]).

Not only does the Adult Authority fail to accord to the parolee an opportunity to be heard at the revocation proceedings as a matter of constitutional right but also in practice it denies the parolee one significant aspect of such a constitutionally protected hearing: the right to present a witness in his behalf. The United States Supreme Court has observed that procedural due process requires that the subject of a governmental hearing " 'have a chance to testify and call other witnesses in his behalf, either by way of defense or explanation.' " (*In re Green* (1962) 369 U.S. 689, 692 [8 L.Ed.2d 198, 201, 82 S.Ct. 1114]; *In re Oliver, supra,* 333 U.S. 257, 275 [92 L.Ed. 682, 695]; *In re Lambert* (1901) 134 Cal. 626, 633 [66 P. 851].)[58]

Although we recognize that representatives of the Adult Authority should retain a wide discretion to conduct the hearing so as to forbid repetitive, irrelevant, and unduly prolonged testimony, we see no justification for an absolute prohibition of oral testimony of a witness in behalf of the parolee.[59] Moreover, we note that federal parole revocation hearings permit the parolee to produce witnesses on his behalf; this procedure does not seem to have unduly hampered the conduct of proceedings. (See 28 C.F.R. § 2.40; *Earnest·*v. *Willingham* (10th Cir. 1969) 406 F.2d 681, 684; *Richardson* v. *Markley* (7th Cir. 1965) 339 F.2d 967, 969; *Reed* v. *Butterworth* (1961) 297 F.2d 776, 778 [111 App.D.C. 365]; *Fleming* v. *Tate, supra,* 156 F.2d 848, 849-850; Note, *Parole Revocation in the Federal System* (1968) 56 Geo.L.J. 705, 716-717.)

---

[58]Until 1941 the parolee in a parole revocation hearing could produce witnesses in his behalf. (*In re Etie, supra,* 27 Cal.2d 753, 758.)

[59]"The right to present evidence is, of course, essential to the fair hearing required by the Due Process Clause. See, e.g., *Morgan* v. *United States* [(1938) 304 U.S. 1] 18; *Baltimore & Ohio R. Co.* v. *United States,* 298 U.S. 349, 368-369, (1936). . . . We do not mean to say that the Commission may not impose reasonable restrictions on the number of witnesses and on the substance of their testimony; we only hold that a person's right to present his case should not be left to the unfettered discretion of the Commission." (*Jenkins* v. *McKeithen, supra,* 395 U.S. 411, 429 [23 L.Ed.2d 404, 421].)

We must conclude that the "opportunity to be heard" comprehends the right to present oral testimony "however brief" and "however informal" of witnesses on behalf of the parolee, who voluntarily attend parole revocation hearings. (*Londoner* v. *City of Denver, supra,* 210 U.S. 373, 385-386; *Boddie* v. *Weakley, supra,* 356 F.2d 242, 244.)

We believe that the Adult Authority does not afford parolees the "opportunity to be heard" at a "meaningful time." Instead, it holds revocation hearings in all cases *after* the parolees have been taken into custody. Due process generally requires that government give the affected individual a hearing *before* and not *after* he is "condemned to suffer grievous loss." (See *Joint Anti-Fascist Refugee Committee* v. *McGrath* (1951) 341 U.S. 123, 168 [95 L.Ed 817, 852, 71 S.Ct. 624] (concurring opn. of Frankfurter, J.); *Wisconsin* v. *Constantineau, supra,* 400 U.S. 433, 436-437 [27 L.Ed.2d 515, 518-519]; *Mendoza* v. *Small Claims Court* (1958) 49 Cal.2d 668, 672 [321 P.2d 9].)

The United States Supreme Court very recently held that due process requires that the recipient of welfare "be afforded an evidentiary hearing *before* the termination of benefits." (*Goldberg* v. *Kelly, supra,* 397 U.S. 254, 260 [25 L.Ed.2d 287, 295].) (Italics in original.) Similarly, procedural due process requires notice and hearing before a creditor can garnish the wages of his debtor (*Sniadach* v. *Family Finance Corp.* (1969) 395 U.S. 337, 339 [23 L.Ed.2d 349, 352-353, 89 S.Ct. 1820]) or a landlord may regain possession of leased premises. (*Mendoza* v. *Small Claims Court, supra,* 49 Cal.2d 668, 672.) In these cases the risk of any immediate and irremediable harm to the public did not outweigh the greater damage to the individual in terminating life-supporting welfare benefits, garnishing wages, or depriving a tenant of shelter.

In applying due process to the problem of determining when the parolee is entitled to hearing prior to revocation, we must distinguish between the kinds of conduct of which the parolee is accused. If the alleged transgression is not criminal in nature, and therefore entails no danger to society, we believe due process requires a hearing prior to imposition of the drastic sanction of imprisonment. For example, if the parolee is suspected of having failed "to conduct [himself] as a good citizen at all times" or having formed an "association with individuals of bad reputation," society suffers no comparable danger to the case in which the Adult Authority has probable cause to believe that the parolee has engaged in criminal conduct while on parole. If the parolee obtains a hearing before he is incarcerated for suspicion of some technical parole violation, he might well be able to prove that he was innocent of such conduct, or, in some circumstances, that the commission of the alleged minor peccadillo did not support revocation.

If the parolee under the present procedures does prove his innocence of the charges after two months of incarceration and he is then restored to parole, irreparable damage will nevertheless have been inflicted. The parolee will have lost his job, the ability to support his family, his status in the community, and the other benefits of the limited liberty which he enjoyed on parole. If the parolee knows that the vaguest rumor, viciously motivated accusation, the unknown charge of the faceless informer, or the slightest mistake could cause his return to prison, he will lose the incentive to succeed in the painstaking rehabilitation process. In sum, if the parolee feels that his freedom and future lie entirely within the grace and complete discretion of the Adult Authority, his motivation and effort to rehabilitate himself must inevitably suffer.[60]

If the parolee engages in criminal conduct as in the present case, however, parole suspension prior to notice and hearing prevents the immediate and grievous risk of harm to the public by minimizing the danger that he will commit further offenses or will go into hiding. (See *In re Marks* (1969) 71 Cal.2d 31, 48 [77 Cal.Rptr. 1, 453 P.2d 441].)[61] Since the parolee has already been convicted of a felony and sentenced to prison, he has lost the presumption of innocence and the right to bail. (See *In re Scaggs* (1956) 47 Cal.2d 416, 418 [303 P.2d 1009].) Clearly, in a situation like that presented by the instant case, in which the Adult Authority had probable cause to believe that Tucker had committed a felony while on parole, the security of society demands the prompt incarceration of the parolee.[62]

The United States Supreme Court has long "recognized that where harm to the public is threatened, and the private interest infringed is reasonably deemed to be of less importance, an official body can take summary action pending a later hearing." (*Goldberg* v. *Kelly, supra,* 397 U.S. 254, 263, fn. 10 [25 L.Ed.2d 287, 296-297], quoting from *R. A. Holman & Co.* v. *Securities and Exchange Commission* (1962) 299 F.2d 127, 131 [112 App.D.C. 43] (suspension of exemption from stock registration requirement); 1 Cooper, State Administrative Law (1965) 140-144.) Hence, the Adult Authority was fully justified in placing a hold on Tucker; thus Tucker, who had already been arrested for possession of a proscribed weapon, could not be released pending the later parole revocation proceedings.

---

[60]See Gaylin, *War Resisters in Prison* (Winter 1969) 12 Colum. Forum 44, 50-51.

[61]We do not here consider the particular procedures and special problems presented by the revocation of conditional release in narcotics commitment proceedings. (*In re Marks, supra,* 71 Cal.2d 31, 47-49.)

[62]Most parole violations submitted to the Adult Authority result from the arrest of parolees for criminal conduct while on parole. (Comment, *Rights Versus Results: Quo Vadis Due Process for Parolees* (1970) 1 Pacific L.J. 321, 341.)

We conclude that due process requires the parolee's "opportunity to be heard" be held "at a meaningful time and in a meaningful manner" (*Goldberg* v. *Kelly, supra,* 397 U.S. 254, 267 [25 L.Ed.2d 287, 298-299]; *Armstrong* v. *Manzo, supra,* 380 U.S. 545, 552 [14 L.Ed.2d 62, 66-67]); thus the parole revocation hearing should occur prior to the incarceration of the parolee who is charged with technical parole violations not constituting criminal conduct.

5. *Due process requires the right to counsel in parole revocation proceedings.*

The due process right to a hearing includes the right to appear by counsel.[63] (*Chandler* v. *Fretag* (1954) 348 U.S. 3, 8-9 [99 L.Ed. 4, 9-10, 75 S.Ct. 1]; *Mendoza* v. *Small Claims Court* (1958) 49 Cal.2d 668, 673 [321 P.2d 9]; *Steen* v. *Board of Civil Service Commrs.* (1945) 26 Cal.2d 716, 727 [160 P.2d 816].) In its consideration of the right to hearing and counsel under the due process clause in *Powell* v. *Alabama* (1932) 287 U.S. 45, 68-69 [77 L.Ed. 158, 170-171, 53 S.Ct. 55, 84 A.L.R. 527], the United States Supreme Court observed, "What, then, does a hearing include? Historically and in practice, in our own country at least, it has always included the right to the aid of counsel when desired and provided by the party asserting the right. The right to be heard would be, in many cases, of little avail if it did not comprehend the right to be heard by counsel. . . . If in any case, civil or criminal, a state or federal court were arbitrarily to refuse to hear a party by counsel, employed by and appearing for him, it reasonably may not be doubted that such a refusal would be a denial of a hearing, and, therefore, of due process in the constitutional sense."

Courts have held that the protection of due process includes the right to appear by retained attorney in an extremely wide variety of civil and administrative proceedings, including proceedings to terminate welfare benefits (*Goldberg* v. *Kelly, supra,* 397 U.S. 254, 270 [25 L.Ed.2d 287, 300]); to discharge a government employee (*Steen* v. *Board of Civil Service Commrs., supra,* 26 Cal.2d 716, 727); to revoke a liquor license (see

---

[63]In *People* v. *St. Martin, supra,* 1 Cal.3d 524, 538, this court left open the question whether the right to counsel applies to the revocation of parole, but held only that there is no right to counsel at Adult Authority proceedings to determine whether sentence should be fixed at less than maximum. (See *In re Schoengarth, supra,* 66 Cal.2d 295, 304 ("no right to the appointment of counsel in proceedings of the Adult Authority to determine whether and under what conditions a prisoner should be granted parole"); *People* v. *Ray, supra,* 181 Cal.App.2d 64, 68 (no right to counsel on determination of length of sentence and grant of parole); Comment (1968) 54 Iowa L.Rev. 497.) This court has never expressly decided whether a parolee has a right to be represented by counsel in parole revocation proceedings. (But see *Mead* v. *California Adult Authority* (9th Cir. 1969) 415 F.2d 767, 768.)

*Molina* v. *Munro* (1956) 145 Cal.App.2d 601, 606-607 [302 P.2d 818]); and to determine eligibility for unemployment compensation (*Staley* v. *California Unemployment Ins. App. Bd.* (1970) 6 Cal.App.3d 675, 678 [86 Cal.Rptr. 294]; see also 5 U.S.C.A. § 555(b) (1967); Gov. Code, § 11509; California Administrative Agency Practice (Cont. Ed. Bar 1970) § 1.30, at p. 26); cf., FTC Announcement, 39 U.S.L.Week. 2364 (1970)).

The logical corrollary of the right to counsel is the right of indigents to the appointment of counsel at state expense in criminal cases (see *Gideon* v. *Wainwright, supra,* 372 U.S. 335, 344 [9 L.Ed.2d 799, 805]) and in proceedings, administrative or otherwise, which assume the formality of civil proceedings but which expose such an indigent to consequences analogous to a criminal conviction. (See, e.g., *Specht* v. *Patterson* (1967) 386 U.S. 605, 608-610 [18 L.Ed.2d 326, 329-331, 87 S.Ct. 1209] (civil commitment of sex offender); *In re Gault, supra,* 387 U.S. 1, 41 [18 L.Ed.2d 527, 553-554] (juvenile proceedings); *In re Harris* (1968) 69 Cal.2d 486, 491 [72 Cal.Rptr. 340, 446 P.2d 148] (mesne process of civil arrest); *People* v. *Shipman* (1965) 62 Cal.2d 226, 232 [42 Cal.Rptr. 1, 397 P.2d 993] (coram nobis); *In re Raner* (1963) 59 Cal.2d 635, 642 [30 Cal.Rptr. 814, 381 P.2d 638] (commitment for narcotics addiction).)

Most recently, the United States Supreme Court has established the right to both retained and appointed counsel in probation revocation hearings. (*Mempa* v. *Rhay, supra,* 389 U.S. 128, 134, 137 [19 L.Ed.2d 336, 340, 341-342].) The court declared that the individual is entitled to counsel "at every stage of a criminal proceeding where substantial rights of a criminal accused may be affected." (389 U.S. at p. 134 [19 L.Ed.2d at p. 340].) Although the Supreme Court has not yet extended *Mempa* to parole revocation,[64] a number of distinguished courts have now held that indigent parolees have the right to appointed counsel in parole revocation proceedings. (See *Bey* v. *Connecticut St. Bd. of Parole* (2d Cir. 1971) 443 F.2d 1079; *Earnest* v. *Moseley* (10th Cir. 1970) 426 F.2d 466, 468-469; *Menechino* v. *Warden* (1971) 27 N.Y.2d 376 [318 N.Y.S.2d 449, 267 N.E.2d 238]; *Warren* v. *Michigan Parole Bd.* (1970) 23 Mich.App. 754 [179 N.W.2d 664]; *Commonwealth* v. *Tinson* (1969) 433 Pa. 328 [249 A.2d 549];

---

[64]*Eason* v. *Dickson* (9th Cir. 1968) 390 F.2d 585, certiorari denied 392 U.S. 914 [20 L.Ed.2d 1373, 88 S.Ct. 2076]; *Rose* v. *Haskins, supra,* 388 F.2d 91, certiorari denied 392 U.S. 946 [20 L.Ed.2d 1408, 88 S.Ct. 2300]; *Williams* v. *Dunbar, supra,* 377 F.2d 505, certiorari denied 389 U.S. 866 [19 L.Ed.2d 137, 88 S.Ct. 131]; *Hyser* v. *Reed, supra,* 318 F.2d 225, certiorari denied 375 U.S. 957 [11 L.Ed.2d 316, 84 S.Ct. 447]; *Washington* v. *Hagan* (3d Cir. 1960) 287 F.2d 332, certiorari denied 366 U.S. 970 [6 L.Ed.2d 1259, 81 S.Ct. 1934]; *Johnson* v. *Stucker* (1969) 203 Kan. 253 [453 P.2d 35], certiorari denied 396 U.S. 904 [24 L.Ed.2d 180, 90 S.Ct. 218].

*Mays* v. *Nelson* (N.D.Cal. 1971) 323 F.Supp. 587, 589-590; *Wilburn* v. *Nelson* (N.D.Cal. 1970) 323 F.Supp. 585, 586-587; *Ellhamer* v. *Wilson* (N.D.Cal. 1969) 312 F.Supp. 1245; *Goolsby* v. *Gagnon* (E.D.Wis. 1971) 322 F.Supp. 460.)

No meaningful distinction can be drawn between the probation revocation hearing involved in *Mempa* and parole revocation proceedings involved here. In hearings both as to revocation of probation and parole the basic question becomes whether the individual has violated the terms of his release. In both situations revocation will result in commitment to prison. In *Mempa* the judge imposed a prison sentence and recommended the length of term the probationer should serve in prison. The Adult Authority not only returns the parolee to prison, but determines, rather than recommends, the length of time which the prisoner will serve. Hence, even more "substantial rights" are "affected" in parole revocation than in probation revocation. Certainly, the assistance of counsel is indispensable and invaluable in both situations.

"Counsel can help delineate the issues, present the factual contentions in an orderly manner, . . . generally safeguard the interests of the" parolee (see *Goldberg* v. *Kelly, supra,* 397 U.S. 254, 270-271 [25 L.Ed.2d 287, 300]), submit mitigating circumstances, and assist the hearing representative in reaching the appropriate decision. (See *Mempa* v. *Rhay, supra,* 389 U.S. 128, 135 [19 L.Ed.2d 336, 340-341]; Kadish, *The Advocate and the Expert-Counsel in the Peno-Correctional Process* (1961) 45 Minn.L.Rev. 803, 830-833.) Furthermore, the Adult Authority may only revoke parole "for cause"; a legal question may arise as to what constitutes "cause" under a particular set of circumstances[65]—an issue which calls for the skill of the lawyer. Basically, the present system requires the parolee to become his own advocate. His lack of skill and training must not only lead to a feeling of frustration that he cannot properly present his case but to a conviction of injustice in being placed in such a predicament. This situation of disparity is incompatible with the basic concept of due process.

Obviously, the length, format, and conduct of the revocation hearing will remain in the sound discretion of the hearing representative. "We do not anticipate that [the assistance of counsel] will unduly prolong or other-

---

[65]*In re Martinez, supra,* 1 Cal.3d 641, 645; *In re Bennett* (1969) 71 Cal.2d 117, 120 [77 Cal.Rptr. 457, 454 P.2d 33]; *In re Brown* (1967) 67 Cal.2d 339, 342 [62 Cal.Rptr. 6, 431 P.2d 630]; *In re Gomez, supra,* 64 Cal.2d 591, 594-595; *In re Hall* (1965) 63 Cal.2d 115, 117-118 [45 Cal.Rptr. 133, 403 P.2d 389]; *State* v. *Black* (Minn.Sup.Ct. 1971) 8 Cr.L.Rep. 2415. As to other legal questions that might arise see also *In re Fluery* (1967) 67 Cal.2d 600, 603 [63 Cal.Rptr. 298, 432 P.2d 986]; *In re Sandel, supra,* 64 Cal.2d 412, 413, 417; *In re Shull* (1944) 23 Cal.2d 745, 753 [146 P.2d 417]; *In re Beasley* (1967) 256 Cal.App.2d 721, 723 [64 Cal.Rptr. 540].

wise encumber the hearing." (*Goldberg* v. *Kelly, supra,* 397 U.S. 254, 271 [25 L.Ed.2d 287, 300].) In any event, the danger of obstructive tactics cannot constitute a reason for barring all attorneys from revocation hearings.

California does not even permit the parolee to be represented by his own retained counsel at the parole revocation hearing—much less by counsel appointed for the indigent parolees. The federal parole system[66] and many state parole boards[67] have for many years permitted retained attorneys to participate in such hearings. We find no indication that this practice has impaired the parole system. The majority's anachronistic position that any due process right of the parolee to retained counsel dissolves in the impracticability of effectuating it, succumbs to the successful practice of permitting such representation by many states and by the federal government. Furthermore, the cost of appointing counsel in parole revocation hearings would impose an insignificant economic burden as compared with the present cost of providing appointed counsel in felony and misdemeanor cases.[68]

In summary, Chief Justice Warren E. Burger recently declared in his State of the Federal Judiciary, "The system of criminal justice must be viewed as a process embracing every phase from crime prevention through the correctional system. We can no longer limit our responsibility to providing defense services for the judicial process, yet continue to be miserly with the needs of correctional institutions and probation and parole services." The first step in the recognition of this newly understood responsibility would be to provide for representation of counsel for a parolee

---

[66]28 C.F.R. § 2.40; *Cotner* v. *United States, supra,* 409 F.2d 853, 855-856; *Boddie* v. *Weakley, supra,* 356 F.2d 242, 243-244; *Starnes* v. *Markley, supra,* 343 F.2d 535, 537; *Glass* v. *Markley, supra,* 339 F.2d 970, 971-972; *Jones* v. *Rivers, supra,* 338 F.2d 862, 865-875; *Stubblefield* v. *Kennedy* (1964) 328 F.2d 526, 527, 528 [117 App.D.C. 225]; *Hyser* v. *Reed, supra,* 318 F.2d 225, 238, 245; *Barnes* v. *Reed* (1962) 301 F.2d 516, 517 [112 App.D.C. 192]; *Reed* v. *Butterworth, supra,* 297 F.2d 776, 778; *Glenn* v. *Reed, supra,* 289 F.2d 462, 463; *Robbins* v. *Reed, supra,* 269 F.2d 242, 243-244; *Fleming* v. *Tate, supra,* 156 F.2d 848, 849.

[67]In 1956 at least 23 jurisdictions permitted the parolee to advise with counsel in preparation for his hearing. Fourteen of these states—Alabama, Arizona, District of Columbia, Florida, Georgia, Idaho, Illinois, Louisiana, Pennsylvania, South Carolina, Utah, and West Virginia—permit counsel to appear at parole revocation hearings. (See Model Pen. Code, § 305.21 (Tentative Draft No. 5, 1956), Comment at p. 117.) Since 1956 Michigan, Montana, Nevada, and Washington have allowed retained counsel in parole revocation hearings. (See *Saunders* v. *Michigan Parole Board* (1968) 15 Mich.App. 183 [166 N.W.2d 278]; Mont. Rev. Code Ann., §§ 94-9835, 94-9838 (1967 Supp.); *Smith* v. *Warden* (1969) 85 Nev. 83 [450 P.2d 356]; W.Va. Code Ann., § 62-12-19 (1966).)

[68]See Van Dyke, *Parole Revocation Hearings in California: The Right to Counsel, supra,* 59 Cal.L.Rev. 1215, 1252; cf. Comment (1968) 56 Cal.L.Rev. 1268, 1469-1472.

in parole revocation proceedings. The basic principles of due process require that a parolee be afforded the right to counsel at such proceedings.

At a time in the development of the law when the improvement of post-conviction procedures for the rehabilitation of offenders has become a matter of first importance and when the protections of due process of law have been both strengthened in content and broadened in application, California lags behind the federal courts and most other jurisdictions in the judicial treatment of parolees. For example, such major states as New York and Pennsylvania now require the appointment of counsel in parole revocation proceedings. This state, however, denies to the parolee *any* protection of due process of law; it accords him not even the rudiments of due process; it does not by law render to the parolee notice of charges of revocation proceedings; it does not by law afford the parolee an opportunity to be heard at the revocation proceedings; it does not permit the parolee to be represented by counsel at the hearing.

The courts have, at the same time, safeguarded the individual from the garnishment of his wages by affording him the protection of due process. The courts have held that the welfare recipient cannot be taken off the rolls without a hearing. The courts have extended the protection of due process to other situations involving the loss of employment and property. Can due process of law be so bifurcated in California that it forbids the state's garnishment of a parolee's property without a hearing but not the seizure of his person? Granted that the parolee must be subject to supervision, he has been accorded his freedom from prison; that freedom is as precious to him as it is to any other person; the deprivation of that freedom is as subject to arbitrary action as it is to any other person. A fundamental purpose of due process of law is to give the individual the chance to be heard so that the ascertainment of the truth will prevent arbitrary and unjust state action. Why should the parolee be denied this chance to be heard?

Peters, J., concurred.

**PETERS, J.**—I dissent. I think a parolee is entitled to the protection of *Miranda* v. *Arizona,* 384 U.S. 436 [16 L.Ed.2d 694, 86 S.Ct. 1602], and that a parolee possesses the constitutional right to counsel at a revocation hearing (*Mempa* v. *Rhay,* 389 U.S. 128 [19 L.Ed.2d 336, 88 S.Ct. 254]). The reasons for my conclusion that parolees are entitled to the *Miranda* protections are fully set forth in my dissenting opinion in *In re Martinez* (1970) 1 Cal.3d 641, 652-657 [83 Cal.Rptr. 382, 463 P.2d 734], and need not be restated here.

On the issue of the right to counsel at parole revocation, I join in Justice Tobriner's scholarly and well reasoned dissent.

A parole revocation constitutes a denial of freedom in its most fundamental sense. It little matters to the parolee how we characterize or label the process by which his life is so greatly altered and his freedom so radically curtailed. For him, the interest at stake and the effect on his life is the same. He faces the exchange of job, home, and normal family life for the four walls of a penal institution. Few proceedings could have a greater impact on his legal rights. The procedural safeguards afforded him must, under the due process clause, reflect this inescapable fact.

So great a curtailment of freedom cannot be swept aside on the theory that the prisoner, while on parole, is subject to restraints and thus has no freedom to lose. Although in the search for simplicity and order there is room in the law for some fictions, this fiction is so divorced from reality that it cannot be tolerated by any fair-minded man.

Nor can the fundamental denial of freedom be ignored on the theory that parole is a matter of grace. Grace, however desirable in absolute monarchs and omnipotent deities, is singularly inappropriate to a system of government ruled by laws. The discretion reposed in officials should be upheld only so long as it is not arbitrarily exercised, and the procedural safeguards against arbitrary exercise of power should be commensurate to the importance and seriousness of the individual rights at stake.

The administrative character of the proceedings likewise furnishes no basis for the denial of due process rights. I cannot believe that the majority is willing to hold that there is no constitutional right to counsel or other due process rights in administrative proceedings such as those before the Public Utilities Commission, taxing agencies, or licensing authorities. To recognize the constitutional right to due process in such proceedings but to deny it in parole revocation proceedings is to lose sight of the fact that the Fourteenth Amendment by its express terms applies to deprivations of liberty as well as property.

Accordingly, I cannot accept the reasoning of the majority opinion and the older cases that the fundamental denial of freedom inherent in parole revocation may be ignored on the basis of a fiction that a parolee has no freedom to lose, on the basis of an archaic and foreign concept of grace, or on the basis of a false assertion rejecting the right to counsel in administrative proceedings.

Although I agree with Justice Mosk that cost is a factor to be considered in seeking a rational answer to the problems confronting us, I cannot agree with his assessment that formal hearings with counsel for the approximately 4,000 parolee suspensions, in his colorful language, "would alone require an undertaking of heroic proportions." Although

the 4,000 figure seems a formidable one at first glance, the burden of undertaking to permit or provide for counsel in 4,000 cases is not great when viewed in the perspective of the great size of our state and the experience of our court system. For example, during the fiscal year of 1968-1969, there were over 220,000 dispositions by municipal courts of misdemeanors other than traffic and intoxication cases, and the municipal courts in Fresno alone disposed of more than 4,000 such misdemeanors. (1971 Judicial Council Report, pp. 189-190.) There were six municipal judges that year in Fresno (*id.,* p. 208), who, of course, were required to deal not only with these misdemeanors but also civil cases, preliminary hearings in felony cases, traffic and intoxication offenses, and numerous other matters. I am informed that during this period there were ordinarily three public defenders in Fresno dealing with all misdemeanors, including traffic and intoxication. The time, effort, and skill of counsel and the judge in sentencing proceedings are not dissimilar from the time, effort, and skill required in parole revocation proceedings, and this experience indicates that providing a reasonable right to be heard with counsel does not involve an overwhelming or even great burden. Moreover, California courts have long permitted appearance with counsel in probation revocation proceedings, and, although such proceedings occur with substantial frequency throughout our state, I am unaware of any claim that recognition of the right to counsel in them has placed a burden of "heroic proportions" upon the bench and bar.

In my view, hearings with counsel would not impose a great burden on the state, and any burden is more than offset when it is remembered that the fundamental right to liberty is at stake. Justice Tobriner has pointed out that the federal government and a number of states, including large ones like Pennsylvania and New York, have accorded the right to counsel in parole revocation proceedings and that due process safeguards do not involve an undue burden on the state.

I would issue the writ.